[No. B051296. Second Dist., Div. One. May 13, 1992.]

REGINALD CLARK, Plaintiff and Respondent, v.
CLAREMONT UNIVERSITY CENTER AND GRADUATE SCHOOL,
Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through VII.

642

**COUNSEL**

O'Melveny & Myers, Catherine B. Hagen, Mia E. Klein and K. Leigh Chapman for Defendant and Appellant.

Kindel & Anderson, Godfrey Isaac and Steven M. Friedman for Plaintiff and Respondent.

## OPINION

**ORTEGA, J.**—Plaintiff Reginald Clark, a former assistant professor at defendant Claremont Graduate School, an unincorporated division of defendant Claremont University Center, filed this race discrimination suit under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)) after being denied promotion and tenure. The jury awarded Clark $1 million in compensatory damages and $16,327 in punitive damages, and the trial court awarded Clark attorney fees of $419,633.13. Defendants appeal from the judgment. In the published portion of the opinion, we hold the verdict is supported by sufficient evidence. We affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

Claremont Graduate School (Claremont) belongs to the six-member Claremont Colleges in Claremont, California. In May 1979, Claremont hired Clark as an assistant professor in its education department for a three-year term. Claremont renewed Clark's contract for a second three-year term in 1982.

According to Claremont's Rules Governing Appointments, Promotions, and Awards of Tenure (APT Rules), a full-time faculty member may not serve without tenure for more than seven years, including any years of prior experience which are credited by Claremont. Clark, who requested and received one year of credit, formally requested tenure in his fifth year at Claremont in 1984.

Clark's departmental review resulted in a five-to-three vote in his favor, but two of the most senior members, the former and current department chairmen who had guided him through the tenure process, voted against him. At the second level of review, the Appointments, Promotions, and Tenure (APT) Committee voted against Clark by a four-to-one vote. Clark appealed to the president, who investigated Clark's racial discrimination allegations and found that at a departmental meeting on Clark's tenure request, a faculty member who voted against Clark had said "us white folks have rights, too." However, the president affirmed the APT Committee's decision because of Clark's insufficient publication record and negative student evaluations. Clark left Claremont when his contract expired unrenewed in 1985.

Because the process as well as the standards for evaluating a candidate's tenure application are significant to our review of the judgment, we will

begin by discussing those factors before describing Clark's background, his experience at Claremont, his tenure review and internal appeal, his FEHA claim and this lawsuit.

## A. The Tenure Review Process

At Claremont, the tenure review process begins within the candidate's own department. The candidate and his department chairman usually begin assembling a dossier in time for review during the sixth year of service. The dossier contains the candidate's vita; copies of his principal publications; five evaluations from qualified and nationally prominent scholars from other institutions (excluding the Claremont Colleges), at least three of whom are not closely associated with the candidate; and evidence of teaching ability, such as letters obtained by the chairman from the candidate's recent graduate students.

In addition, the dossier contains the department chairman's letter of recommendation based on a majority vote of the tenured faculty members who met and conferred on the candidate's qualifications for tenure. If the vote was not unanimous, the dissenting faculty members must submit their own letters of dissent to the APT Committee.

The candidate's completed dossier, including the department chairman's letter of recommendation and any letters of dissent, is then transmitted to the APT Committee. The APT Committee is an interdepartmental body with five full professors elected by the faculty at large.

The APT Committee then makes its recommendation by majority vote to the dean of faculty, executive dean, and president (who comprise the administration), who may make their own recommendations to the trustees (board of fellows) for or against the candidate. The board of fellows has the ultimate power of making appointments, promotions, and awards of tenure.

## B. Standards for Tenure

Claremont's stated requirements for tenure are scholarly achievement, teaching ability, and community service.

In practice, Claremont was applying these standards more stringently in 1984, when Clark was reviewed, than 10 years earlier. This was not due to any change in the written rules. It happened gradually as the school's orientation shifted from teaching to research.

As a graduate research institution, Claremont primarily serves degreed students who are pursuing research careers. Accordingly, Claremont mainly

hires senior faculty members who, unlike Clark, come in with tenure at the full professor level. This means fewer tenure decisions are made at Claremont than at other types of schools.

As a research university, Claremont views scholarly achievement as essential for tenure. Without demonstrated scholarly achievement, Claremont will deny tenure even though the candidate is an excellent teacher. On the other hand, because of its small enrollment and faculty, each faculty member must also be a proficient teacher. Accordingly, even a candidate with top marks for scholarly achievement may still be denied tenure if he is deficient as a teacher.

In judging a candidate's teaching ability, Claremont relies on student evaluations and letters. In judging a candidate's scholarly achievement, Claremont's unwritten practice is to give the most weight to books or articles published by university presses or refereed journals.[1] Technical research reports and invited papers are given less weight, and are insufficient by themselves to satisfy the scholarly achievement requirement.

The education faculty had no written guidelines identifying the necessary publications for meeting the scholarly achievement requirement for tenure at the time of Clark's review.

## C. *Clark's Background*

Clark, born on November 15, 1949, was raised with four siblings in Chicago, Illinois. His mother worked as a domestic. After graduating from high school in 1967, Clark briefly attended a community college and Indiana State University before transferring to Howard University in Washington, D.C. There he received a bachelor of fine arts degree with a minor in sociology of education in 1971.

Clark then pursued advanced degrees in education at the University of Wisconsin at Madison, which is ranked among the top five education schools in the nation. Clark earned two master's degrees and a doctorate in May 1977. Clark received the National Fellowship Funds Award, the Southern Fellowship Funds Award, and the Education Opportunity Program Award.

While pursuing his doctorate, Clark took a leave to teach at Chicago State University during the 1974-1975 and 1975-1976 terms. Clark taught a

---

[1]"In the academic world, it is considered significantly more prestigious to have one's work published in a refereed journal. A refereed journal typically employs independent scholars, chosen from the academic discipline in which the submitted article falls, to review the article in a blind process to determine whether it is of publishable quality. [Citation.]" (*Roebuck* v. *Drexel University* (3d Cir. 1988) 852 F.2d 715, 718, fn. 2.) University presses operate in a similar manner by submitting the work to reviewers prior to publication.

psychology class called Cultural Factors in Learning which focused on how the social cultures of various ethnic and racial groups influence the learning process. Clark also taught courses in the Education Curriculum Instruction Department. In addition, Clark published an article in a refereed journal at the University of Southern California on how Black urban youth are socialized by attending dance parties.

Clark then returned to the University of Wisconsin and successfully completed his dissertation, "Black Families as Educators, a Qualitative Inquiry." Clark intended his 422-page dissertation to be the first of a 3-phase, 10-year cross-cultural research project which would explain, among other things, why some students do well in school and others do not. In his dissertation, Clark had more narrowly focused on 13 Black students in Chicago who were from similar social backgrounds but performed quite differently at school. As a result of his dissertation research, Clark developed a series of 20 or 21 hypotheses which he planned to pursue in his second and third phases of cross-cultural research.

Upon receiving his doctorate in May 1977, Clark worked as a research associate for the Illinois Board of Higher Education from the fall of 1977 to the spring of 1979. Clark also obtained a publishing contract from the prestigious University of Chicago Press and began writing a book based on his dissertation.

Because his career goal was college teaching and research, Clark responded in late 1978 to a job advertisement for a position in multicultural and urban education at Claremont.

D. *Clark's Experience at Claremont*

When Clark interviewed for the position in April 1979, Conrad Briner, chairman of the education faculty, told Clark he would probably receive tenure in three to four years if his book was finished by then. Several others also expressed this view to Clark: Caroline Ellner, Claremont's assistant dean, search committee chair, and member of the education faculty; Joseph Weeres, also a member of the education faculty; and Paul Albrecht, Claremont's dean.

Dean Albrecht specifically told Clark that tenure was "something formally worked out at [the] departmental level." When Clark inquired about receiving credit for his two prior years at Chicago State University, Dean Albrecht said that should not be a problem, that this "was something that is routinely handled at the departmental level[,] [a]nd referred [Clark] back to Conrad Briner on that point."

When Clark began working as an assistant professor in August 1979 under a 3-year contract, Claremont had about 65 to 70 faculty members, none of whom were racial minorities. About four or five years prior to Clark's arrival, a Black female professor, Delores Cross, had worked on the education faculty but she left before being considered for tenure. The education faculty had about eight members.

Early in the 1979 fall term, Chairman Briner told Clark how pleased he was that Clark was on board and could fill a gap in the curriculum concerning family research. In response to Briner's inquiry about his future research, Clark described his plan to do a cross-cultural analysis of families with children in the elementary grades in Los Angeles. Briner responded enthusiastically and stated that Clark's focus on minority groups was an advantage because there had not been many multicultural offerings for students prior to Clark's arrival. Briner instructed Clark to pursue his research project, to involve graduate students in the project, and to develop graduate seminars on multicultural education and family life.

With respect to tenure, Chairman Briner also told Clark early in the fall of 1979 that the quality, not quantity, of Clark's publications would be important. Briner informed Clark his future book would be helpful in obtaining tenure because the publisher was a respected university press. Briner related that articles published in refereed journals were next in importance and would carry more weight than articles in nonrefereed journals. Papers presented at national conferences would be given the least weight. Briner explained that it would take two or three conference papers to compare to one refereed journal article. Briner mentioned teaching and community service as the remaining tenure requirements but told Clark not to worry about them.

Clark also discussed tenure with another education faculty member, Phillip Dreyer, in the fall of 1979. Professor Dreyer advised Clark to "be in close communication with Conrad Briner about the tenure matters." Dreyer also expressed his approval of Clark's upcoming book and research proposal.

In the 1979-1980 term, Clark developed and taught four new seminars on perspectives in multicultural education, psychosocial aspects of learning in urban-western families, sociological dimensions of education, and social psychology of education. Clark also prepared a theoretical paper and questionaires for his research project with students in the Los Angeles Unified School District.

In the 1980-1981 term, Clark continued teaching his seminars and developed two new ones. Clark presented an article, "Significant Concerns for

Analyzing How Home Life Affects Literacy Development," at the annual Claremont Reading Conference, which was published in the conference's yearbook. In addition, Clark presented papers at the annual meeting of the American Educational Research Association in Los Angeles, at a school administrators' conference sponsored by California State University, Fullerton, at a meeting of the National Association of Social Workers, and at the San Diego State Educational Service Conference.

That same term, Clark attended a department subcommittee meeting concerning student admissions in which Professor Dreyer lamented the fact that so few minority students ever scored high enough on the General Record Examination to be admitted to the program. Clark, who had been told by Assistant Dean Ellner that Claremont was "not historically a diverse institution in terms of thought," and to "speak up" and "say what you think about those issues because these people need to hear what you have to say," attempted to explain why test scores should not be weighed as heavily for minority students. Clark pointed out "that the Educational Testing Service had been doing research over the last several years and had ascertained that there was not a relationship between the scores the students get, particularly minority students get on those tests and how well they would do in a graduate program." Clark suggested that by using other criteria to evaluate applicants, the department would probably be able to admit more minority students. Dreyer disagreed, stating he believed the scores "did mean something."

Also that term, Clark was reminded on two occasions in front of his colleagues that he is Black. At a 1981 dinner party, Professor Kerchner called Clark by the name "Calhoun," which was the name of a stereotypical Black character on the old Amos and Andy television show. Moreover, at another faculty dinner that year, Chairman Briner told Clark to pass the dinner rolls, "boy."

In the 1981-1982 term, Clark developed and taught another new seminar called, "Introduction to the Sociology of Education." He also taught his other seminars and wrote two papers. The first, a 1,137-page technical report funded by the Spencer Foundation in Chicago, Illinois, entitled "Community Opportunity Structure, Family Interaction and Children[']s Cognitive Development," was based on Clark's research in 1980-1981 with 33 Hispanic, Black, White, and Asian families in Los Angeles. The second, a paper on the quality of family pedagogic life, was presented at the annual meeting of the American Education Research Association in Boston. In addition, Clark volunteered on the human services commission for the City of Claremont.

The 1982 term, however, was marred by the racial vandalism and ransacking of some faculty offices in the education department. Clark's office was

broken into, ransacked, and spray painted with a "nigger inscription" on the wall. Several other offices were also damaged.

Upon discovering the vandalism, Clark's colleagues questioned Clark. Professor Weeres asked Clark if he knew anything about the incident. Similarly, Chairman Briner questioned Clark and remarked that "this never happened before you came." Professor Kerchner said to Clark, "God damnit, Reg, now, look what you have done." Later that evening, Professor Dreyer dropped by Clark's house with some beer, ostensibly to see how Clark was doing. However, Dreyer also questioned Clark about his movements the previous day. According to Clark, Dreyer said "someone had taken a valuable plaque of his. He did not know who was behind it. He was hoping it was not some jealous person who would do that to him. He did not know who did it. [¶] He asked me again, are you sure you did not go out at all last night?"

Midway into the 1981-1982 term, Chairman Briner asked Clark to list his accomplishments in connection with his upcoming contract renewal evaluation. Briner told Clark his work was going well and that positive comments about him had been received from people outside the university and from his students. Briner also assured Clark he was "on target for the objectives we had set out . . . back in April of '79 in which I would pursue the tenure status in three or four years." However, Briner questioned Clark about when his book would be published. "He said, I am supporting you. I am saying it now. You have to get that book published first."

Clark received a second three-year contract and continued teaching his seminars during the 1982-1983 year. In addition, several students were enrolled with Clark for their doctoral studies, which meant they had selected Clark to assist them in completing their dissertation research. Clark also presented a research paper that year at the American Sociological Association in San Francisco entitled, "Family Organization, Communication Styles and Children's Competence in Urban Black Homes." This paper was eventually published in 1987 after Clark's unsuccessful tenure review.

In November of that term, Clark and Chairman Briner organized Claremont's National Symposium on Productive Urban Schools which showcased Clark's research and focused on methods of increasing productivity at urban schools attended by minorities and poor White children. Clark presented a well-received paper at the conference. Afterward, Briner wrote a congratulatory letter to Clark which stated in part: "How do I know what I say is a fact? People made a point of telling me. I was very proud for you, and the other members of the Education Faculty, as each person in one way or

another exclaimed that you were a highlight of the entire conference. [¶] I know you worked long and hard to prepare for this conference. You now can regard your efforts as having paid off."

Also that term, Clark, who was on Claremont's Affirmative Action Committee, had another conversation with Professor Dreyer concerning the admission of minority students. Clark testified that during this conversation, Dreyer "said he was sorry about what happened to Delores Cross, a black woman and that he simply couldn't get along with her when she was there. He liked her at first but he felt she got upset when he came in and got tenure before her, even though she had been there for several years before him, even though she had more publications than he had. [¶] He said, I tried to talk with her on one occasion, but she would not hear it. And then he recounted that he seemed to always have trouble with black women. [¶] He said, I get along with a few of them but a lot of them, I don't know. I use all the psychology I know, all the little strategies I have learned and non[e] of them seem to work. [¶] He said, Sandra Cox, she always had a chip on her shoulder. She came in here . . . talking this radical stuff and wanted to use African-American in her work. I am so happy that you helped me out by taking her off my hands. [¶] He asked me if I could give him any insight as to what was going on with Mark Bell. And then I said, well, it's probably just a miscommunication of some sort. Probably can be cleared up. [¶] He said, well, one way of handling the situation would be to just avoid admitting so many of them, and that way we wouldn't get a critical mass and it wouldn't be an issue."

In the same term, Clark also discussed affirmative action with Dean Albrecht. Albrecht had told Clark "to push the affirmative action issue" because "we needed affirmative action around there," and to come to him with any ideas. But when Clark brought suggestions to Albrecht about offering a minority education course to undergraduates, and forming a committee to infuse some multiracial content into each of the graduate programs, Albrecht failed to respond.

In the 1983-1984 term, Clark developed another new seminar entitled, "Contemporary Family Dynamics." Clark also taught his other seminars and presented or published several papers that term. The first and most significant publication was Clark's book, "Family Life and School Achievement," which was published that fall by the University of Chicago Press. Second, Clark submitted a paper on major social change initiatives for effective education in the Black community to the National Black Law Journal at Boalt Hall and UCLA School of Law. Although this paper was accepted for publication, it did not appear in print until after Clark's unsuccessful tenure

review. Third, Clark presented a research paper at the annual meeting of the Western Educational Research Association in New Orleans on children's literacy and learning among various social groups. In addition, Clark presented a paper at Claremont's Reading Conference entitled, "Family Life, School Life and the Production of Literacy." This paper was not published however, based on the decision of Professor Douglass, the new chair of the education department, who edited the yearbook.

Clark applied for tenure during his fifth term of service, the 1983-1984 school year.

E. *Clark's Tenure Review*

After his book came out in the fall of 1983 and received favorable reviews, Clark met with Chairman Douglass and asked for his assistance in initiating the tenure review process. During this January 1984 conversation, Douglass asked Clark to describe his publications while at Claremont. Clark described the article published in the Claremont Reading Conference, 45th Year Book; the technical report submitted to the Spencer Foundation; the book published by the University of Chicago Press; the article that had been accepted for future publication by the National Black Law Journal at Boalt Hall and the UCLA School of Law (Douglass did not include this in the dossier); the article in the Journal of Sociology and Social Research (Douglass did not include this in the dossier); and several other papers for conferences which Clark thought were of publishable quality.

Chairman Douglass replied that he had not realized the extent of Clark's work, and proceeded to list the items Clark would need for his dossier. Pursuant to this list, Clark gave Douglass the names of 10 experts in his field, including 6 whom he did not know personally, and the names of graduate students to whom he had given dissertation support.

Chairman Douglass sent packets of Clark's written work to five outside scholars in Clark's field and asked for their evaluations and recommendations on tenure for Clark. The five scholars unanimously praised Clark's work in general, with the most favorable reviewers calling Clark's book a major breakthrough and benchmark in the field of family research, and describing his later work as building on that research and providing further significant contributions to knowledge and practice. Several other reviewers also praised Clark's book but made some substantive criticisms and mentioned that he should publish more refereed articles. However, the reviewers unanimously stated Clark should be granted tenure.

Chairman Douglass also solicited letters of evaluation from each of Clark's approximately 100 students. Of the 50 responses, 38 were favorable

but 12 were negative. The favorable student evaluations often described Clark in glowing terms as an enthusiastic, creative, energetic teacher who inspired and motivated his students. But the negative evaluations reflected concern over his sudden mood swings, rudeness, defensiveness, loss of temper, and shouting matches with students who questioned or disagreed with his theories.

While Clark's tenure request was in the departmental review stage, Clark, who was viewing a tape in the audiovisual room, happened to hear loud voices next door. It turned out that the department was holding a faculty meeting on Clark's tenure request. Clark overheard Professor Kerchner say, "Who in the hell does he think he is anyway. Let's make him wait a couple of years and show him how we do things around here." Clark then heard Kerchner say, "Yeah, we don't have to review his request for a raise, do we? I mean, us [sic] white people have rights too." Then a voice said, "No, we are not here to review his request for a raise. He's asked the dean for the dean's review. [¶] What we are here to do is talk about his request for tenure."

Clark then heard Professor Dreyer say: "Well, you know, let's review where we are. Now, we are all agreed he's got the potential for greatness, perhaps. But you know I just don't know how I would really feel. I have been giving that a lot of thought going to these conferences with him, and I have been thinking about it seriously. I don't know how I would feel working on a permanent base [sic] with a black man."

By this time, Clark had started taking notes of the conversation. He then heard Professor Shuster say, "Well, we are not under any obligation to have any blacks because we are a private college. It's the public universities that are under that constraint right now."

Professor Drew then said: "Well, one thing is for sure. If we keep him around here, we will have to do what it takes to help him succeed."

Professor Shuster said: "Well, one thing I will say. We won't find another black with as much an effect as he has."

An unidentified person said: "Well, let's tell Conrad [Briner]. Let's tell him his teaching is bad. And let Con be the one that tells him. He trusts Con the most. He will accept it if it comes from Con."

In response, Professor Weeres said: "No, he won't. He's too proud. He won't buy it. He thinks he's a fantastic teacher. He wouldn't go for it."

Clark testified that the discussion then turned to the question of whether President Maguire would "go along with this." Someone said, "First, we know what we will do at the A.P.T. level. We will take care of that. Then it is in the hands of Maguire. Then we think he'll go along with it."

Clark withdrew to his office and thought the matter over. He realized that if he complained to someone, the education faculty members could simply deny his allegations. Clark decided to wait and see what the education faculty's recommendation would be.

### 1. *The Departmental Recommendation*

The education faculty voted to recommend Clark for tenure by a five-to-three vote. The negative votes were cast by Chairman Douglass, who had put together Clark's dossier and excluded several articles, including the Boalt article which had been accepted for publication and the refereed journal article which Clark published prior to coming to Claremont; former Chairman Briner ("pass the dinner rolls, 'boy' "), who had supported and worked with Clark the most, and had advised him to take one year of credit if his book would be published in the 1983-1984 term; and Professor Kerchner, who in the departmental tenure review meeting had said "us white people have rights, too."

In compliance with his duty as chairman, Douglass wrote the letter of transmittal reporting the majority's recommendation to the APT Committee. However, Douglass also wrote separately (as required by the rules) to express his disagreement with the majority opinion. Former Chairman Briner and Professor Kerchner also wrote separate letters of disagreement.

Of the three department members who had cast negative votes, only Chairman Briner testified at trial. Briner testified that he had talked to Clark several times about the "gameplan" for satisfying the tenure publication requirements. Briner claimed he had told Clark to get the book, two refereed journal articles, and the technical Spencer report published before seeking tenure. Briner assisted Clark in making contacts at the Spencer Foundation and the Los Angeles Unified School District.

Briner said he had warned Clark about the pros and cons of shortening the tenure clock by seeking credit for two years of prior experience. Briner advised Clark against asking Dean Spanier to credit him for his two years at Chicago State if "the manuscripts were not going to be ready." Briner told Clark that the decision to ask for credit was Clark's, but that he did not recommend it. Briner even went to see Dean Spanier, who had replaced

Albrecht in that position, to express his concern that Clark would not have his journal articles published if the tenure clock was shortened.

Clark recounted a different version of Chairman Briner's advice on seeking credit. Clark initially wanted to take two years of credit because Briner had told him when he was hired that he could expect to be tenured after three or four years if his book was out by then. When Clark later discussed this with Briner, Briner again emphasized that the book had to be published and reviewed before Clark's tenure hearings. Briner advised Clark to take only one year of credit if he was sure the book would be published in time for the tenure hearings. Briner advised Clark to otherwise wait until his sixth year, "[b]ut if you think that it will be out next year, that is, sometime in the 83-84 school year, in time so we can get the reviews, then take the one year." When Clark's book came out in the fall 1983-1984 term, Clark, believing he had fulfilled Briner's expectations, asked Dean Spanier for a year's credit and applied for tenure that spring.

When Clark applied for tenure, the two refereed journal articles that Briner considered part of the game plan had not been accepted for publication. The articles were, however, included in the dossier as unpublished works. Briner, who said he supported Clark for tenure "up until the last minute," testified that he "voted, no, for basically one reason. That was the lack of publications to satisfy scholarly achievement criteria." Clark, however, did not know that Briner had voted against him because the two journal articles were not published.

Professor Dreyer, who was Briner's sabbatical replacement on the APT Committee that semester, admitted to raising the issue of race at one of the three departmental meetings on Clark's tenure request. Dreyer testified, however, that he discussed race in a positive manner: "I said that Dr. Clark is a black scholar. I said that Dr. Clark had spoken to me many times about what it was like being a black person in Claremont. He had reported to me that he had been discriminated against. He had been called names while he was jogging on the streets, and I thought that it was important for us [to] think about this in light of this case. [¶] I felt that in light of the concern we had about his teaching and our concerns with his research that we needed perhaps to give him some consideration on those issues."

Dreyer denied making the comment that he was not sure about working with a Black man on a permanent basis. However, Dreyer confirmed that Kerchner had said, "us white people have rights, too. "

Dreyer testified that he voted for Clark at the departmental level because he wanted to give Clark the benefit of the doubt despite his reservations about Clark's teaching and research.

## 2. *The APT Committee's Recommendation*

The APT Committee met once after receiving copies of Clark's completed dossier. At that meeting, the APT Committee members, with the exception of Professor Dreyer, quickly went around the table and indicated within a matter of minutes that tenure should be denied.

Dreyer, who had elected to speak last, then spoke about the department's three meetings on Clark: "I described what we had thought about the research as we discussed it in the first meeting. I described what [we] had said in the second meeting primarily about teaching, and I pointed out that we had tried to look carefully at the letters of evaluation that the students had sent in to find out anything we could about the students that had written in to see if the letters were reliable.

"I wanted the APT to know, as far as we could tell, the students that had written were reliable and the letters should be taken seriously. I was particularly careful to point out the mixed feelings that we had and that the decision to vote had[] not been reached easily or with any kind of unanimity. They knew it already, because they had the three d[iss]enting letters.

"I also talked about the . . . fact that Dr. Clark is black and that we are an affirmative action school. I wanted to represent his point of view about that and raise it to the attention of the APT in a similar way that I had done so with the Faculty in Education. I didn't know, for example, whether everyone in the APT Committee personally knew Dr. Clark. I didn't know whether they were aware that he is black, so I just wanted to make sure that they understood that before we came to a formal vote."

Dreyer cast the lone vote in favor of Clark; the rest of the committee voted against tenure. At trial, Dreyer explained that he believed Clark's case was very similar to that of Frank Whigham, a White male on the education faculty who was unanimously denied tenure by the APT Committee that same term. Whigham, like Clark, had "strong letters from students saying that the teaching was poor." Dreyer, who had voted against Whigham, testified he would have voted against Clark at the APT Committee meeting but for Clark's race.

Dreyer admitted, however, that when he received tenure at Claremont in 1977, only one year after his arrival, he had published only one article in the Claremont Reading Conference that year, and had published only one book and five articles in nonrefereed journals in the preceding five years at another institution where he was denied tenure.

Professor Willett, chairman of the APT Committee during Clark's review, testified that during that academic year, the APT Committee had voted against Clark and Whigham and for Poplin, a White female education faculty member with a far superior record of publication and teaching than either Clark or Whigham. Willett felt he could not vote for Clark after having just voted against Whigham, who had less serious student criticisms than Clark. While Willett believed Clark had not published enough, he conceded that Clark's book was superior to Whigham's. On the other hand, even if Clark had met the scholarship requirement, Willett would have voted against Clark due to the unusually negative student evaluations.

### 3. *Clark's Internal Appeal*

When Briner notified Clark that the APT Committee had denied tenure, Clark still believed that Briner had voted for him. Clark asked Briner about his appeal rights. Briner advised him of those rights and said he was supporting Clark.

Clark then asked Claremont's administration to review the matter, but did not mention discrimination. President Maguire and Deans Spanier and Albrecht reviewed the APT Committee's decision and upheld the denial of tenure.

One month after the first internal review, Clark asked President Maguire for "compensatory consideration" based on race. It is undisputed that had Claremont granted Clark tenure, he would have been the first tenured minority faculty member in the school's history.

One week after asking for "compensatory consideration," Clark spoke with President Maguire about having been discriminated against by several of his education faculty colleagues. Clark described how by chance, he had overheard one of the education faculty meetings in which his tenure request was discussed. Clark told Maguire about Kerchner's statement, "us white folks have rights too," and Dreyer's statement that he "couldn't work on a permanent basis with a black man."

When Maguire investigated Clark's claims, Kerchner admitted making the remark. But Kerchner explained he was only trying to be funny about recent salary increases and the possibility that Clark's increase was larger than Kerchner's as a result of Clark's appeal to the dean. Maguire reprimanded Kerchner in front of his colleagues for making the remark, but concluded Kerchner's vote against tenure was not based on race.

Maguire found no corroborating evidence of the remark attributed to Dreyer; Dreyer denied making the remark, and his colleagues supported his

denial. Maguire found on the contrary that Dreyer had voted in favor of tenure at both the department and APT Committee levels.

Maguire concluded the education faculty's proceedings were not tainted by racial prejudice. Maguire further determined, based on his review of the materials contained in Clark's dossier, that Clark had not met Claremont's teaching and scholarship requirements for tenure. Accordingly, Maguire did not ask the Board of Fellows to overturn the APT Committee's decision to deny tenure. Maguire met with Clark to discuss the results of his inquiry and then formally notified him by letter that the APT Committee's denial of tenure would stand.

### F. Clark's FEHA Claim & Lawsuit

Clark filed a complaint against Claremont with the California Department of Fair Employment and Housing, alleging he was a victim of race discrimination.[2] On May 5, 1985, the department gave Clark a right-to-sue letter.

After being denied tenure, Clark "became extremely depressed" and, during the initial months, experienced "body pains, physical hurts, constant headaches, an inability to get moving, get going, and general despair." These symptoms had eased somewhat by the time of trial, as Clark had tried to "put [his] life back together" and "take [a] positive mental attitude about what . . . happened . . . ."

---

[2] " 'The California Fair Employment Practice Act (FEPA) was enacted in 1959 (Lab. Code, former § 1410 et seq.; see Stats. 1959, ch. 121, § 1, pp. 1999-2005) and recodified in 1980 as part of the FEHA (Stats. 1980, ch. 992, § 4, p. 3140 et seq.). "The law establishes that freedom from job discrimination on specified grounds, . . . is a civil right. ([Gov. Code] § 12921.) It declares that such discrimination is against public policy (§ 12920) and an unlawful employment practice (§ 12940). [Fn. omitted.]" (*Commodore Home [Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 213 (185 Cal. Rptr. 270, 649 P.2d 912)].) The statute creates two administrative bodies: the Department of Fair Employment and Housing (the department) (§ 12901), whose function is to investigate, conciliate, and seek redress of claimed discrimination (§ 12930), and the commission, which performs adjudicatory and rulemaking functions (§ 12935; see also § 12930). An aggrieved person may file a complaint with the department (§ 12960), which must promptly investigate (§ 12963). If the department deems a claim valid it seeks to resolve the matter—in confidence—by conference, conciliation, and persuasion. (§ 12963.7.) If that fails or seems inappropriate, the department may issue an accusation to be heard by the commission. (§§ 12965, subd. (a), 12969.) The department acts as prosecutor on the accusation and argues the complainant's case before the commission. (*State Personnel Bd.* v. *Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 428 [217 Cal.Rptr. 16, 703 P.2d 354]; *Commodore Home, supra,* 32 Cal.3d at p. 213.)

" 'If an accusation is not issued within 150 days after the filing of the complaint or if the department either determines not to prosecute the case and the matter is not otherwise resolved, the department must give the complainant a "right to sue" letter. The complainant may then bring a civil suit in superior court. (§ 12965, subd. (b); see *Commodore Home, supra,* 32 Cal.3d at pp. 213-214.)' (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1383-1384 [241 Cal.Rptr. 67, 743 P.2d 1323].)" (*Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1283-1284 [261 Cal.Rptr. 204].)

During Clark's last year at Claremont, he was earning about $28,000 annually. After leaving Claremont, Clark began a nationwide job search, and made unsuccessful inquiries at various institutions including Catholic University of America, Memphis State University, Vanderbilt, and Harvard Graduate School of Education.

In 1988, Clark began working as a part-time teacher at California State University, Fullerton, earning $5,786 per semester. In January 1990, Clark became a full-time lecturer at Fullerton on a semester-by-semester renewal basis, earning $3,176 per month.

In addition to his employment at Fullerton, Clark did consulting work for government agencies and foundations around the country, including the Department of Education; Education Commission of the States in Denver; Rockefeller Foundation; Southern Educational Foundation in Atlanta; Counsel of Chief State School Officers in Washington, D.C.; Houton, Mifflin Publishing Company in Boston; Southern Christian Leadership Conference in Los Angeles; and Academy of Educational Development in Washington, D.C. Clark also consulted with the California, Colorado, and Missouri Departments of Education, and public school systems in Jackson, Mississippi; Anchorage, Alaska; Chicago, Illinois; Montgomery County, Maryland; New York City; St. Paul, Minnesota; Tucson, Arizona; Des Moines, Iowa; San Diego; Los Angeles; and Pasadena. Clark also consulted with universities such as Montclair State University, University of Cincinnati, and University of Rhode Island.

On May 2, 1986, Clark filed this action for damages for racial discrimination against defendants under the FEHA. (Gov. Code, § 12900 et seq.) The complaint alleged disparate treatment and disparate impact theories of employment discrimination.[3]

In addition to the evidence described above, Clark produced evidence that Professor Weeres, who had voted in favor of Clark at the departmental

---

[3]To establish employment discrimination by disparate treatment, the employee must show the employer treated the employee differently because of the employee's race, color, religion, sex, or national origin. (See *Ibarbia* v. *Regents of University of California* (1987) 191 Cal.App.3d 1318, 1327 [237 Cal.Rptr. 92].) "In *Teamsters* v. *United States* (1977) 431 U.S. 324 [52 L.Ed.2d 396, 97 S.Ct. 1843], the Supreme Court stated that conceptually the theory of ' "[d]isparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin.' (*Id.*, at pp. 335-336, fn. 15 [52 L.Ed.2d at p. 415].)" (*Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317 [237 Cal.Rptr. 884].)

To establish employment discrimination by disparate impact, the employee need not show the employer's discriminatory intent. (*Ibarbia* v. *Regents of University of California, supra,* 191 Cal.App.3d at p. 1328.) In disparate impact cases, the employee must show that the employer's facially neutral practices had a disparate impact on members of the employee's racial group. (*Id.* at pp. 1327-1328.) As we will discuss, *post,* the disparate impact theory was

meeting, was granted tenure at Claremont in 1978 with a slim publication record consisting of only five articles, three of which were technical reports. Luenette Montle, Weeres's former student, testified that in a class concerning the influence of politics and racism on education, Weeres mentioned in passing "that over the years that he had been at Claremont Graduate School he did not know of a black professor being tenured there. [¶] He made this certain giggling or laughed and said that Doctor Clark was there, and he truly doubted that he was going to be tenured. It was just a flippant, off the cuff remark without the details."

Clark also challenged Chairman Douglass's and Dean Spanier's failure to consult with the head of the Affirmative Action Committee after he was denied tenure. John Elliott, a professor at University of Southern California, testified as Clark's expert witness on tenure practices. Elliott explained that the affirmative action rules in the Claremont Graduate School Handbook required the department chair and dean, " 'prior to either non-renewal of contract or termination for other reasons on grounds which may involve faculty affirmative action, . . . [to] consult with faculty affirmative action chair to review the proposed decision in violation of that policy.' " In Elliott's opinion, the failure to meet with the affirmative action chairperson was a violation of this rule.

Clark further challenged President Maguire's failure to overturn the APT Committee's negative recommendation despite the confirmation of Kerchner's remark, "us white people have rights, too." Clark maintained that Maguire should have known that racial prejudice existed at Claremont because when Maguire first came to Claremont in 1981, he was told by an "old friend, Professor Agnes Jackson, a black woman professor at one of the Claremont Colleges," that " 'Claremont was through and through racist.' "

In addition, Clark impeached President Maguire with his deposition testimony concerning his investigation of Clark's claims. At trial, Maguire testified that he knew from his investigation that Kerchner really did say "us white people have rights, too." Maguire testified at trial that Kerchner's remark was "tasteless, rotten, rude," and "a smart ass remark." However, at his deposition, President Maguire *denied* that his investigation had substantiated Kerchner's remark. When confronted with his prior inconsistent deposition testimony, Maguire denied being advised to change his trial testimony after education faculty members had acknowledged Kerchner's remark in their depositions. Maguire explained that his recollection at trial was simply different than it was during his deposition.

---

removed from the jury in this case, and we are thus only concerned with the disparate treatment theory of discrimination.

In addition, Clark established that when Maguire was president of State University of New York at Old Westbury prior to coming to Claremont, the college was accused of racism by a coalition of some 20 civil rights organizations concerning an alleged drop in enrollment of Black students and loss of Black faculty members. There was a student strike and faculty revolt in which the entire faculty voted 57-4 to censure Maguire and 53-7 to dismiss him.

Claremont, on the other hand, maintained that Maguire's refusal to overturn the APT Committee's decision was not based on racism. Claremont presented evidence that Maguire was a long-standing civil rights champion and "freedom rider" who was jailed with Dr. Martin Luther King, Jr., and had "put his life on the line." Maguire is a life member of the Board of Trustees of the Martin Luther King Center for Social Change, a cochair of the NAACP Legal Defense Fund, and has organized local independent colleges to provide financial support to Black students. Of the 11 race discrimination lawsuits brought against Old Westbury College during Maguire's 11-year term as president, the courts found in favor of the college in each case. And it was Maguire who had proposed to the governor of New York to devote the school to urban minorities and to hire mainly minority faculty and staff members.

Claremont also pointed out that Clark had never chaired a dissertation committee during his years at Claremont, which "[i]ndicates that the area of research that [Clark was] pursuing ha[d] no real, general interest to students, or that [Clark] ha[d] failed to establish a kind of rapport with students that would be inviting for them to work with him . . . ."

## G. *The Verdict*

The first trial in March 1989 ended in a mistrial due to juror attrition on the sixth day of deliberations.

The second trial took place a year later. After both sides rested, the trial court granted Claremont's motion for directed verdict on the disparate impact theory.

With respect to Clark's sole remaining claim of disparate treatment, the jury received a verdict form containing three questions. The trial court instructed the jury to "[a]nswer the questions according to the directions of the form and all of the instructions of the court. As soon as any nine or more jurors have agreed upon a verdict, if any nine or more jurors have agreed upon the answer to the questions of the verdict, have it signed and dated by your foreperson . . . ."

The first question required the jury to decide whether Claremont was liable for racial discrimination. Nine jurors found Claremont liable, two jurors were undecided (Johnson and Yamasaki), and one juror abstained (Folk).

The second question required the jury to assess Clark's compensatory damages. Eleven jurors voted to award Clark $1 million, and one juror (Johnson) was undecided.

The third question required the jury to determine whether Claremont was liable for punitive damages. The same 11 jurors found Claremont liable for punitive damages, and Johnson remained undecided.

After the jury returned its verdict, the parties presented evidence on the amount of punitive damages. The jury received additional instructions and deliberated further before imposing $16,327 in punitive damages.

Over Claremont's objection, the trial court awarded Clark attorney fees of $419,633.13. The court entered judgment for Clark, and denied Claremont's motions for new trial and judgment notwithstanding the verdict.

Claremont appeals from the judgment.

### Issues on Appeal

Claremont raises the following issues: (I) insufficiency of the evidence; (II) instructional error on agency; (III) instructional error on Claremont's burden of proof; (IV) erroneous admission of evidence; (V) erroneous denial of Claremont's motion to strike Clark's request for jury trial; (VI) the compensatory damage award was improper, excessive and unsupported by substantial evidence; and (VII) the attorney fee award was excessive.

### Discussion

#### I

■ Claremont claims the jury's verdict that Clark was denied tenure because of his race is not supported by substantial evidence. Claremont asks us to reverse the judgment based on the uncontradicted evidence of its legitimate business reasons for denying Clark tenure.

At the outset, we note the trial court denied Claremont's motion for judgment notwithstanding the verdict. We agree with the trial court's determination that the evidence, viewed in the light most favorable to Clark, was sufficient to support the verdict.[4]

■ Both the FEHA and title VII of the Federal Civil Rights Act (42 U.S.C. § 2000e et seq.) prohibit employers from discharging or otherwise discriminating against a person on the basis of race in compensation, terms, conditions, or privileges of employment. (Gov. Code, § 12940, subd. (a); *Mixon v. Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1316.) Although the state and federal antidiscrimination legislation "differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute. [Citations.]" (*Mixon,* at pp. 1316-1317.)

■ In most disparate treatment employment discrimination cases, the plaintiff will lack direct evidence of the employer's discriminatory intent, which is a necessary element to prevail. (*Mixon v. Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1317.) "Consequently certain rules regarding the allocation of burdens and order or presentation of proof have developed in order to achieve a fair determination of 'the elusive factual question of intentional discrimination.' (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 101 S.Ct. 1089].) A three-part analysis was mandated by the Supreme Court in the case of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]: (1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive." (*Mixon v. Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1317.)

We hold the federal *McDonnell Douglas* test provides the applicable standard of proof in this case. Other published decisions under the FEHA have repeatedly referred to federal decisions under title VII for guidance, under the theory that our " 'courts, while not bound, cannot overlook the applicable federal law in a significant and emerging area, such as [employment] discrimination . . . .' (*Prescod v. Unemployment Ins. Appeals. Bd.* (1976) 57 Cal.App.3d 29, 40 [127 Cal.Rptr. 540].)" (*Ibarbia v. Regents of University of California, supra,* 191 Cal.App.3d at p. 1326, fn. 5; accord *University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1035-1036 [272 Cal.Rptr. 264]; *Watson v. Department of Rehabilitation, supra,* 212 Cal.App.3d at pp. 1289-1290; *Mixon v. Fair Employment &*

---

[4]Although the trial court also denied the new trial motion, Claremont did not raise insufficiency of the evidence in that motion.

*Housing Com.*, *supra*, 192 Cal.App.3d at pp. 1316-1320; *County of Alameda v. Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 504 [200 Cal.Rptr. 381].)

■ Under the *McDonnell Douglas* test, a prima facie case of employment discrimination through disparate treatment is established if the plaintiff shows: " '(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.' (*McDonnell Douglas Corp.* v. *Green* [(1973)] 411 U.S. [792,] 802 [36 L.Ed.[2d 668] 677], . . . fn. omitted.) This is not intended to be an inflexible rule. 'The facts necessarily will vary in [t]itle VII cases, and the specification above of the prima facie proof . . . is not necessarily applicable in every respect to differing factual situations.' (*Id.*, fn. 13 [36 L.Ed.[2d] at pp. 677-678].) What is clear, however, is that 'a [t]itle VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act." [Citation.]' (*Furnco Construction Corp.* v. *Waters* . . . [(1978)] 438 U.S. [567,] 576 [57 L.Ed.2d [957,] 966].)" (*Ibarbia* v. *Regents of University of California, supra*, 191 Cal.App.3d at pp. 1327-1328.)[5]

■ If the employee establishes a prima facie case, "the employer must offer a legitimate reason for his actions . . . ." (*Mixon* v. *Fair Employment & Housing Com., supra*, 192 Cal.App.3d at p. 1317.) However, the burden of persuasion never shifts to the employer; it remains at all times with the employee. (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 253-256 [67 L.Ed.2d 207, 215-217, 101 S.Ct. 1089].) "If the plaintiff establishes a prima facie case, the defendant bears only a burden of going forward with additional evidence of legitimate nondiscriminatory reasons. The defendant does not take on a burden of persuasion." (*Sumner* v. *San Diego Urban League, Inc.* (9th Cir. 1982) 681 F.2d 1140, 1142.)

The employer, in order to meet its burden of going forward with additional evidence, "need not persuade the court that it was actually motivated by the

---

[5]The fourth prima facie requirement, that the position remained open and the employer continued to seek applicants, has not been applied strictly in tenure cases. Usually a candidate is not qualified to apply for tenure until the sixth year of service, which means the position may not be filled immediately. "[B]ecause of the uniqueness of the tenure decision, in that an unsuccessful candidate is not necessarily replaced by a successful one, the [fourth point] of the prima facie showing can be satisfied by showing that tenure positions 'were open at the time plaintiff was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time plaintiff was denied tenure.' [Citation.]" (*Roebuck* v. *Drexel University, supra*, 852 F.2d at p. 726.)

proffered reasons. [Citation.] It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]. To accomplish this, the [employer] must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's] rejection. The explanation provided must be legally sufficient to justify a judgment for the [employer]. If the [employer] carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. at pp. 254-255 [67 L.Ed.2d at p. 216], fns. omitted.)

This means "that the [employer's] burden of 'articulating some legitimate, non-discriminatory reason' [*Furnco Construction Corp.* v. *Waters* (1978) 438 U.S. 567, 578 (57 L.Ed.2d 957, 968, 98 S.Ct. 2943)] is significantly less than proving the absence of discriminatory motive." (*Lynn* v. *Regents of the University of California* (9th Cir. 1981) 656 F.2d 1337, 1344, fn. omitted.) For "if employers were required to prove the absence of discriminatory motive, the third stage of the *McDonnell Douglas* analysis would be superfluous, 'since it would place on the employer at the second stage the burden of showing that the reason for the rejection was not a pretext, rather than requiring contrary proof from the employee as a part of the third step.' [*Board of Trustees of Keene St. Col.* v. *Sweeney* [(1978)] 439 U.S. [24], at 24 n. 1, 99 S.Ct. at 295 n.1.]" (*Lynn* v. *Regents of the University of California, supra,* 656 F.2d at p. 1344, fn. 6.)

█ If the employer successfully rebuts the presumption raised by the prima facie case, "the *McDonnell/Burdine* presumption 'drops from the case' and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff. [Citation.] In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's." (*Mixon* v. *Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1319.)

In the third stage of the *McDonnell Douglas* test, the employee, who "retains the burden of persuasion[,] . . . now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination. [The employee] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [Citation.]" (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. at p. 256 [67 L.Ed.2d at p. 217].)

Many courts have used the term "pretext" in describing the employee's burden of persuading the court that the employer's proffered explanation is unworthy of belief. (See *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 [36 L.Ed.2d 668, 677-679, 93 S.Ct. 1817]; *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at pp. 253, 256 [67 L.Ed.2d at pp. 215, 217]; *University of Southern California v. Superior Court, supra,* 222 Cal.App.3d at pp. 1035, 1037; *County of Alameda v. Fair Employment & Housing Com., supra,* 153 Cal.App.3d at p. 504.) The United States Supreme Court has explained that "pretext" refers to "but for" causation. (*McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 282, fn. 10 [49 L.Ed.2d 493, 502, 96 S.Ct. 2574].)[6] The employee need not show "he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies . . . ." (*Ibid.*) In other words, "[w]hile a complainant need not prove that racial animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a 'causal connection' between the employee's protected status and the adverse employment decision." (*Mixon v. Fair Employment & Housing Com., supra,* 192 Cal.App.3d at p. 1319.)

 In proving causation, a plaintiff who was denied tenure "need not prove intentional discrimination at every stage of the review process. It is true that University guidelines and witness testimony support [Claremont's] claim that each successive evaluator performed a de novo review of [Clark's] candidacy. Nevertheless, it is also uncontroverted that at each stage of the process the evaluator had available *and considered* the reports and

[6]In *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. 792, the employer refused to rehire a former employee who had participated in illegally blocking traffic into the employer's plant. (The former employee had been arrested, convicted, and fined for obstructing traffic.) After being denied employment, the former employee sued, claiming he was a victim of race discrimination. The Supreme Court concluded the former employee had adequately stated a claim under title VII, but noted: "Title VII does not, without more, compel rehiring of [the former employee], neither does it permit [the employer] to use [the former employee's] conduct as a pretext for the sort of discrimination prohibited by [the Act]. On remand, [the former employee] must . . . be afforded a fair opportunity to show that [the employer's] stated reason for [the former employee's] rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against [the employer] of comparable seriousness to the [employee's acts] were nevertheless retained or rehired. [The employer] may justifiably refuse to rehire one who has engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races." (*Id.* at p. 804 [36 L.Ed.2d at p. 679].)

The United States Supreme Court later discussed the above quoted passage in *McDonald v. Santa Fe Trail Transp. Co., supra,* 427 U.S. at page 282, footnote 10 [49 L.Ed.2d at page 502]: "The use of the term 'pretext' in this context does not mean, of course, that the Title VII plaintiff must show that he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies; as the closing sentence to the quoted passage makes clear, no more is required to be shown than that race was a 'but for' cause. See also *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 (1975)."

recommendations of each previous evaluator. . . . Hence it plainly is permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision." (*Roebuck* v. *Drexel University, supra,* 852 F.2d at p. 727.)

When Clark was hired, Dean Albrecht told Clark that tenure was "something formally worked out at [the] departmental level." Both Albrecht and Professor Dreyer advised Clark to work with Chairman Briner on tenure matters. Clark followed this advice and consulted with Chairman Briner, who became instrumental in Clark's tenure preparations.

Chairman Briner told Clark at the outset that he could expect to receive tenure in three or four years if his book was published by then. Briner helped Clark draw up a "gameplan" for meeting the publication requirements, told Clark he was on track for meeting those requirements, advised him to take a year of credit if his book would be ready by the 1983-1984 term, and repeatedly told Clark he was supporting him. In particular, Briner wrote a letter praising Clark's work in glowing terms following the November 1982 national symposium at Claremont which highlighted Clark's research.[7]

While Briner claimed he advised Clark to postpone his tenure review until the book and two refereed journal *articles* were published, the jury was free to believe Clark's testimony that Briner had told him only to wait until his *book* was published. The jury was also justified in accepting Clark's testimony that Briner had told him that two or three unpublished conference papers would equal one refereed journal article. The evidence supports an inference that Briner misled Clark by describing publication requirements that were more lenient than the ones Briner ultimately applied in voting against Clark's tenure request.

The fact that Briner also found Clark deficient as a teacher does not dispel the inference that Briner discriminated against Clark. It is undisputed that Clark received 12 negative student evaluations, and that such criticisms, if credible and recent enough to be probative, would have been sufficient to justify a negative tenure decision. However, the jury was free to decide that once Chairman Briner gave Clark a discriminatory rating on his publications, his decision to accept the criticisms of Clark's teaching abilities would have come out differently but for that discrimination.

In *Roebuck* v. *Drexel University, supra,* 852 F.2d at page 734, a title VII racial discrimination case brought by an assistant professor who was denied

---

[7]During argument, Clark's attorney repeatedly told the jury that the years of positive feedback followed by the denial of tenure constituted fraud.

tenure, the court noted that "separate votes were not even taken on each prong of the tenure decision; the committee merely voted yea or nay on the ultimate determination. Hence, once the jury concluded that a particular rating decision at any given level was motivated by discrimination and would have come out differently but for that discrimination, the jury was also free to infer that that discrimination infected other decisions concerning the very same candidate and made at the very same time."

In *Roebuck* the court pointed out that once the jury found that the department chairman had applied discriminatory standards in evaluating Roebuck's service activities, "common sense allows the jury to conclude that [the department chairman] was similarly willing to allow race to determine his rating of Roebuck's other qualifications. And, as already noted, each successive decisionmaker had before it the decisions and reports of the prior levels, hence any decision which itself was infected with discrimination would have tainted the entire process." (852 F.2d at p. 734, fns. omitted)

In a footnote, the court in *Roebuck* then went on to state: "Cf. *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115 (N.D.Ill.1986), where the court held that an individual employment decision should not be treated as a [¶] [']watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from (that is, irrelevant to) every other decision. In the real world . . . human beings (including triers of fact) are not compelled to reason that way. If an employer discloses a[] . . . race-biased mindset, it is certainly a permissible inference that the mindset is not focused solely on the individual employee to whom or about whom the specific statement was made.['] (*Id.* at 1129.) [¶] . . . [W]e review here a jury verdict, and thus we must assume that the jury did in fact address each of [the university's] proffered justifications and that the jury did in fact find that discrimination tainted the entire tenure decision process. . . ." (*Roebuck v. Drexel University, supra*, 852 F.2d at p. 734, fn. 32.)

The jury in this case was further justified in inferring that the discriminatory rating of Clark's abilities carried over into the APT Committee's proceedings and tainted that determination as well. The jury was free to infer that Professor Dreyer's true motive in discussing race at the APT Committee meeting was to underscore Clark's deficiencies as a scholar and teacher. Although Dreyer voted in favor of Clark at each level, Dreyer's remarks were quite negative. At the APT Committee meeting, Dreyer listed the departmental criticisms of Clark's scholarship and teaching in a manner that implied Clark's only qualification for tenure was his race.

There was ample evidence to support an inference that Professor Dreyer felt uncomfortable working with Clark due to his race. According to Clark's

testimony, Dreyer told Clark he was against admitting a "critical mass" of minority students; Dreyer resisted Clark's efforts to deemphasize test scores in order to admit more qualified minority students; Dreyer admitted to Clark he had problems getting along with Black women, and spoke disparagingly about a student who used the term African-American in her work. The jury could reasonably infer from this evidence that Dreyer resented Clark's presence at Claremont because of his race and his activism.[8]

Another permissible inference was that at least some of the department members decided to use Dreyer's lukewarm support of Clark as a subterfuge for discrimination. Clark overheard one of the department members say that they knew how to handle the APT Committee, and that Maguire would go along with their decision.

Claremont places great reliance on the fact that the discriminatory remarks were only made by education faculty members, and not by either the APT Committee members who voted against Clark or President Maguire. However, Clark is not required to prove intentional discrimination at each level of the review process. (*Roebuck* v. *Drexel University, supra*, 852 F.2d at p. 727.) The jury was entitled to rely on: the evidence that Chairman Briner misled Clark concerning publication requirements and gave him a discriminatory review; the conceded remark by Professor Kerchner ("us white people have rights, too") who wrote a negative letter to the APT Committee; the evidence that Dreyer's lukewarm support for Clark before the APT Committee was a subterfuge for discrimination; the statistical evidence that Claremont had never granted tenure to a minority professor (see *Lynn* v. *Regents of the University of California, supra*, 656 F.2d at p. 1342); the testimony by other scholars concerning the excellence of Clark's work and the groundbreaking nature of Clark's book; the granting of tenure to other nonminority professors (Professors Dreyer and Weeres) who had less substantial publishing records; and Claremont's use of changing, unwritten publication standards to justify its denial of tenure to Clark.

---

[8]Although Clark testified about Dreyer's various comments from which the jury could reasonably infer a discriminatory intent, Clark's attorney did not emphasize Clark's testimony about Dreyer in his closing argument. Instead, Clark's attorney's jury argument addressed Dreyer's favorable votes for Clark and Dreyer's explanation about putting the race issue on the table in order to test his colleagues: "You don't test colleagues unless they need testing. [¶] One of two things. Either Phillip Dreyer was a bigot, and I am not suggesting that. But either Phillip Dreyer was a bigot and wanted to see if his fellow professors would agree with him—that does not seem likely because he voted in favor of Reginald Clark, or Professor Phillip Dreyer knew that his colleagues thought and he knew what they bore within their hearts racial animosity. . . ."

This jury argument could reasonably be interpreted as a subtle tactic for acknowledging Dreyer's two affirmative votes in Clark's favor, but suggesting that Dreyer nevertheless harbored a discriminatory intent. We do not believe this argument precluded the jury from inferring a discriminatory intent based on Clark's testimony concerning Dreyer's remarks.

Each stage of the tenure review process is not compartmentalized. In practical terms, the most significant step in the entire process appears to be the departmental review, which lays the groundwork for subsequent levels of review. The evidence discloses that the tenure decision is "routinely handled at the departmental level"; candidates are expected to work closely with their department chairs to prepare for their tenure reviews; and department chairs decide which written works to place in the candidate's dossier. The rules expressly require separate letters be sent to the APT Committee from the department members who voted against the candidate. The negative letters from Chairmen Briner and Douglass and Professor Kerchner were expressly relied upon in this case by the APT Committee and administration, and ultimately infected their decisions. (See *Roebuck* v. *Drexel University*, *supra*, 852 F.2d at p. 734.)

President Maguire's independent investigation and review of Clark's case does not insulate Claremont from liability as a matter of law. President Maguire admittedly has an impressive record of civil rights activism, and he made no discriminatory remarks against Clark. However, the record also indicates Maguire came under intense criticism at another university for alleged racial discrimination. Clark also impeached Maguire with his prior inconsistent deposition testimony that Kerchner's remark ("us white people have rights, too") was not substantiated. There was enough impeachment evidence to cast doubt on Maguire's credibility and the honesty of his investigation. The evidence warrants an inference that Maguire intentionally ignored substantial evidence of discrimination at the most critical juncture in the review process and simply rubber stamped the APT Committee's decision which was also infected by discrimination.

In order to overturn the judgment for lack of substantial evidence, we would have to find the inferences drawn by the jury wholly inappropriate. According to the rule of conflicting evidence, "[w]here different inferences may reasonably be drawn from undisputed evidence, the conclusion of the jury or trial judge must be accepted by the appellate court." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 288, p. 300.) An exception to this rule exists "if the inference was wholly improper. Thus, the evidence may be such that only one inference could be drawn by a reasonable person; or, though the inference could properly be drawn from certain evidence, it is conclusively rebutted by other evidence. In this situation, the question is one of law and the unwarranted inference will not support the judgment." (9 Witkin, Cal. Procedure, *supra*, § 289, p. 301.)

Because the inferences drawn by the jury in this case were not improper, we are bound by them. As we stated earlier, the jury was justified

in inferring that the entire tenure process was tainted by discrimination. (See *Roebuck* v. *Drexel University, supra,* 852 F.2d at p. 734.)

Claremont cites a host of age discrimination cases (29 U.S.C. § 621 et seq.) for the proposition that alleged statements by lower level managers do not support an inference of discrimination against the company's ultimate decision maker. (See *McDonald* v. *Union Camp Corp.* (6th Cir. 1990) 898 F.2d 1155, 1161; *Mauter* v. *Hardy Corp.* (11th Cir. 1987) 825 F.2d 1554, 1558; *La Montagne* v. *American Convenience Products, Inc.* (7th Cir. 1984) 750 F.2d 1405, 1412-1413; *Stendebach* v. *CPC Intern., Inc.* (5th Cir. 1982) 691 F.2d 735, 738; *Kustes* v. *Bituminous Ins. Co.* (C.D. Ill. 1987) 701 F.Supp. 165, 167-168.) Claremont's cases are distinguishable because they did not involve multilevel tenure review processes; they generally involved corporate reductions in force justified by economic reasons. Accordingly, those cases do not require us to reject the inferences drawn by the jury in this case.

We must add we are not surprised by the jury's verdict. Many employment discrimination cases do not even survive to trial because evidence of the employer's improper motive is so difficult to obtain. This case is unusual, not because of Clark's claims, but because of Clark's strong evidence of improper motive. Our own computer-assisted research of tenure denial cases across the nation revealed none involving university professors who made such blatant remarks as in this case. We hold the jury's verdict is supported by substantial evidence.

## II - VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We affirm the judgment and award Clark costs and attorney fees on appeal. We direct the trial court on remand to determine a reasonable amount of attorney fees on appeal.

Devich, Acting P. J., and Vogel, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 23, 1992. Panelli, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 639.