Filed 3/23/15  Dawson v. Country Club of Rancho Bernardo CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KRISTEN DAWSON, | D064654 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00091828-CU-OE-CTL) |
| COUNTRY CLUB OF RANCHO BERNARDO, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Reversed with directions.

Law Offices of Johanna S. Schiavoni, Johanna S. Schiavoni; Gruenberg Law, Josh D. Gruenberg and Susan M. Swan for Plaintiff and Appellant.

Stutz Artiano Shinoff & Holtz, Jack M. Sleeth, Jr., and Melissa A. Lewis for Defendant and Respondent.

Kristen Dawson, an employee of the Country Club of Rancho Bernardo (the Club), sued the Club and her supervisor, Joe Furlow (together, Defendants), alleging causes of action for sexual harassment under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] and intentional infliction of emotional distress. She also sued the Club for failure to prevent harassment, wrongful termination in violation of public policy, and retaliation. The trial court granted Defendants' motion for summary adjudication of Dawson's harassment, failure to prevent harassment, and intentional infliction of emotional distress claims. The trial court later granted the Club's motion for summary judgment of Dawson's claims for wrongful termination in violation of public policy and retaliation. Dawson appeals the judgment.

We conclude the trial court erred by granting summary adjudication and summary judgment of Dawson's claims. When viewing the evidence in the light most favorable to Dawson, she has raised triable issues of material fact in connection with each cause of action. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Club hired Dawson as a dining room supervisor in February 2008. She began as an hourly employee, but was quickly promoted to the salaried position of food and beverage manager, overseeing 20 restaurant staff.

In October 2010 the Club hired Furlow as clubhouse manager. He became Dawson's direct supervisor.

---

[1] Statutory references are to the Government Code unless otherwise specified.

2

On December 12, 2010, Furlow sent an e-mail from "joe_furlow@yahoo.com" to Dawson's Club e-mail address that said, "lets get you some golf lessons sometime soon, ok?!"[2] Dawson interpreted this as Furlow offering to have a Club golf pro provide her with some lessons, so she responded on December 14, "I am definitely on board for golf lessons sometime soon!" On December 17, Furlow responded, "OK, happy to give you some anytime, lets figure out a day and maybe we could grab lunch or dinner too? Shoot me your personal e-mail too if thats ok, I don't want this to be a work thing!" This e-mail "automatically made [Dawson] uncomfortable," so she did not respond; instead, she discussed it with coworker Don Murders, her boyfriend, and her father.

On December 23, Furlow sent another e-mail from his yahoo.com account to Dawson's Club address. He suggested meeting at an offsite driving range so that Club members would not distract them. Furlow added, golf "is certainly not . . . an easy game at times, but playing with friends and adding libations can enhance the experience." Dawson was still uncomfortable, so again she did not respond.

On January 2, 2011, Furlow sent two more e-mails from his yahoo.com account to Dawson's Club account. In the first, he asked, "Just checking to see if you are up for some golf lessons after work Tuesday?" In the second, he stated (in part), "There is a driving range one exit north of pomerado, we should go there Tuesday, ok? I am staying the night, so if you want, let's go have some dinner and talk about dinner menu and wine

---

2      As is often the case, the e-mail communications in the appellate record contain typographical errors and do not always observe proper grammatical and capitalization conventions. We quote from the e-mails without correction.

list.  Have you been to barrel room?"  The e-mails made Dawson uncomfortable because Furlow was her "boss" and she interpreted the overnight reference as "insinuating something."

Murders was with Dawson when she received the January 2 e-mail.  Dawson wanted to write Furlow an e-mail "in a way that would not offend him, if he were to get upset, that [she] didn't want to do dinner with him or have him teach [her] golf lessons."  Murders helped Dawson draft the following response, which she sent Furlow on January 2:  "I want to make our restaurant something that we are both proud of as well. . . .  My only concern is that I don't want to be in a position to give members or staff any reason to make any kind of assumptions if they saw the two of us together off premises.  I know it might sound a bit paranoid, but I have seen how fast rumors can spread and unfortunately, it has happened to me in the past where members and/or staff had made false assumptions.  This can occur in any business setting, and although as innocent as it may be, some people could perceive it differently which is sad that they would do such a thing.  With that being said, I am not willing to take that risk.  [¶] . . . I would be completely fine with a group setting to visit different restaurants, etc."

A few days later, Furlow dropped by Dawson's office and asked, "Are we okay?"  Furlow said he was "concerned" about Dawson's e-mail and did not "want [her] to think [he] want[ed] to make this a work thing."  Dawson described him as being "a little huffy and puffy about it."  Trying to "calm the situation," Dawson responded that she thought his ideas were good, but she only wanted to do things in a group setting with other managers.  Furlow became defensive.  He said, "Well, the club can't afford to take

4

everyone out to dinner all the time," and claimed the Club's board of directors and his wife knew about his plans to take Dawson to other restaurants to taste items.

A few weeks later, Furlow approached Dawson at work and said they needed to talk. They went into Furlow's office, he shut the door, and said, "We have a problem . . . . My wife found the e-mails . . . . [¶] and she's really upset and she's going to contact you and she said she's going to e-mail you. . . . All I ask is when you receive that e-mail that you delete it and don't read it and I'll get this taken care of." Dawson was "dumbfounded" because she did not think she had done anything wrong. Furlow explained that he had marital problems—his wife had cheated on him and they had "trust issues." Dawson was uncomfortable discussing Furlow's personal life with him. She said she would delete any e-mail from his wife, and the conversation ended. Dawson never received an e-mail from Furlow's wife.

In February, on Dawson's third employment anniversary, the Club's board of directors issued her a commendation noting her personal contribution to the Club's success.

On February 20, a Sunday that Dawson had off from work, Furlow called her on her personal cell phone while she was vacationing in Palm Springs with her roommate, her boyfriend, his sister, and the sister's husband. Furlow told Dawson he thought they "had a moment"—"I looked at you and you looked at me" and "we had a moment"—in the kitchen at work the previous Friday. Dawson had no idea what Furlow was talking about and told him she did not feel the same. Furlow responded, "if you didn't feel it, then that's fine. I just think that you're a really beautiful girl and that any guy would be

5

lucky to have you. And I'm just going through a rough patch right now, and I don't know what you want from me." Dawson told Furlow five or six times, "[A]ll I'm looking for from you is a professional working relationship." Furlow responded, "Okay," but then proceeded to tell Dawson he was going to leave his wife because she cheated on him and they had trust issues, that his dad encouraged him to get a divorce, and that he wanted to move to San Diego from Long Beach and bring his kids with him. Dawson got off the phone as quickly as possible. She told her family and friends how much the call bothered her, and that if Furlow kept it up, she would report it to the Club's human resources (HR) department.

Within weeks, Furlow began making changes around the clubhouse and bar without telling Dawson, even though the changes were within her responsibilities. Furlow hired three new employees without Dawson's input; bypassed Dawson to meet with her subordinates about changes or concerns, instead of discussing them with Dawson as he had done before; and made changes, like offering a new wine or changing the dining room setup, without notifying Dawson.

On April 11, another of Dawson's days off, Furlow called her on her personal cell phone to "clear some things up." Dawson responded that she was at a memorial service and could not talk.

On April 14, Dawson received a voicemail from one of the Club's wine vendors who was expressing disappointment that he would no longer be working with the Club. Dawson went to Furlow's office to ask that he let her know of such changes in the future, as wine vendor relationships related to her job duties. Furlow became very aggressive,

6

yelling that he was "outraged" that Dawson would "defend a vendor." Furlow yelled so loudly that a coworker whose office was near Furlow's became concerned. Dawson left Furlow's office very upset.

The following day, April 15, Furlow asked Dawson to come to his office. He whispered to Dawson, "I'm really concerned about your mental health." He then confronted her with a printout of an e-mail exchange between "kristen-dawson@live.com" and "joe@uptoparstaffing.com" (one of Furlow's e-mail addresses). The first e-mail was dated April 11 from "joe@uptoparstaffing.com" and read: "Why don't we talk today via phone.. What time works for you?" The response dated April 14 from "kristen-dawson@live.com" read, "[W]e need to talk.....you are quite the dick. or do you even have one? could be fun, not sure your agenda, kind of a insecure control freak, huh?"

Furlow asked Dawson, "What is this? Do I need to . . . have my attorney present?" Dawson read the e-mail exchange. She had never used the "kristen-dawson@live.com" address and was unfamiliar with the "live.com" domain. Dawson responded, "I did not write this. You know I didn't do this . . . . Are you really doing this right now?" Furlow replied, "Well, I have a lot more where those came from." Dawson had Murders and the Club's HR representative, Melissa Stotz, come to Furlow's office to witness their conversation. Stotz observed Dawson to be visibly shaken.

Stotz entered Furlow's office and asked what was happening. Furlow said Dawson had been sending him e-mails, calling him names, and that he would go to the Club's board. Furlow presented the e-mail to Stotz to read. After reading it, Stotz thought it did

7

not "seem like something [Dawson] would write." Stotz immediately contacted the Club's president (Rick Lindsey), and the board's HR chairman (Bob Walder). Stotz informed Dawson that Walder and Lindsey would come to the Club later that day. Dawson went home to calm down and to retrieve printed copies of the e-mails from Furlow's yahoo.com account.

Dawson met with Lindsey and Walder later in the day on April 15. She explained everything that had happened between her and Furlow, beginning with the e-mails from his yahoo.com account that began in December and ending with the revelation of the live.com e-mail Furlow showed her.

Furlow gave Walder printouts of more than 30 additional e-mails between Furlow's three different e-mail accounts—his Club account, "jfurlow39@gmail.com" and "joe@uptoparstaffing.com"—and "kristen-dawson@live.com."[3] The live.com e-mails began on December 18, 2010 with an e-mail from "Dawson" to Furlow's Club account asking him to give her golf lessons, adding "I don't want this to be a work thing . . . . maybe [we can] grab lunch or dinner afterwards?"[4] Furlow responded on December 21, offering to provide lessons after the rain stops. "Dawson" later responded, "Now that the rain has stopped, lets figure out a date soon. I dont want to make this a work obligation either. So, if thats ok, can we keep this non-working? Hope that makes sense. If you

---

[3]    There appear to be some duplicates within this tally due to replies and forwards that contained prior e-mail messages.

[4]    This e-mail was sent the day after Furlow's follow-up e-mail to Dawson's Club account wherein he offered to give her lessons not as part of any "work thing."

8

want, send me your personal e-mail so we keep it out of that arena." Furlow responded on December 23 with a response nearly identical to his December 23 e-mail from his yahoo.com account to Dawson's Club account regarding offsite lessons.[5]

On January 2, 2011, Furlow sent "Dawson" an e-mail from his uptoparstaffing.com e-mail address that is nearly identical to the January 2 e-mail from his yahoo.com account to Dawson's Club account regarding the offsite driving range and Furlow's overnight stay. "Dawson" responded on January 8, stating, "Would be great to see you off schedule but while we are working together it doesn't work for me. So until then, just wanted you to know and keep it status quo."

On January 23 and 24, Furlow exchanged several e-mails with "Dawson" from his gmail.com account. In them, Furlow confides in "Dawson" about his unhappy marriage and his wife's infidelity. Apparently in response to "Dawson's" suggestion that the two of them take a trip,[6] Furlow wrote, "I dont know what a dinner or drink after hours would lead to, but I am curious about it to be honest. I understand your reasonings to go far far away, but how far is far far away Oceanside, Downtown SD, Carlsbad or Alaska or Hawaii? Just kidding." Furlow also wrote, "the emails we have shared are both dangerous and more dangerous."

"Dawson" responded on January 23 by thanking the "Tough Ass" for "opening up" about his problems and by consoling him. "She" also clarified that by "far away" she

---

[5]    The only difference is that the response to "Dawson" also provided Furlow's uptoparstaffing.com e-mail address.

[6]    The e-mail containing that apparent suggestion is not in the appellate record.

9

meant traveling to a desert golf course for an overnight stay with two other coworkers, but suggesting that if "she" and Furlow "had close or attached rooms and a few drinks after meetings, that might be nice."  The e-mail was signed "Kristen xo."

Furlow responded on January 24 by opening up further, writing seven additional paragraphs about his marital situation.  He also wrote, "I think you and I need to go have a drink!  I would at least like to try to have a conversation with you (away from work) and see what happens.  If there is a spark, they we can deal with that.  However, if there is not a spark (or one of us does not get a spark), no harm no foul and we just work together.  I enjoy working with you and I don't want to try to make something out of anything if nothing is there.  Lets go have a drink just you and I and take it from there.  No trips, no overnight stays, let's go have an uncomfortable drink."

"Dawson" responded on January 24 by providing advice about infidelity, therapy, and children.  She also wrote, "I'd love to get to know you better and think you could do better and make this work for you.  You are what many of us are looking for and I'd hate to see you wait until you are 50 to figure that out.  So, let's keep that drink on hold until you've had time to think and reply back, OK?  [¶]  xxxxoooo Kristen."

On March 22, "Dawson" e-mailed Furlow asking if they could meet offsite, repeatedly calling him a "hardass," and concluding "must be so much fun being miserable."

On March 24, "Dawson" sent the following e-mail to Furlow's uptoparstaffing.com and gmail.com accounts:  "Joe—i wanted to check and see if i shared your e-mail to me about your whole marriage and inviting me to a drink and told

10

our board how we did more after a drink and that as my manager you used your position and i fealt sexually exploited what you might say.  you know i was vulnerable and only trying to win the approval of the new boss, right?  i know when i mentioned something to Ed K. he was interested.  maybe i should share this with you wife too?  she seemed to nail me pretty quick, wonder what she'd do if i told her how we had sex and how quick you went after me?  you have made me feel badly and all i wanted was to do a good job."

On April 3, "Dawson" forwarded Furlow "their" January 23 and 24 e-mail exchanges with this new message:  "Wonder what the board or SD labor relations or your wife would think??  You are an unhappy guy, you could be very happy if you wanted though."

On April 6, "Dawson" e-mailed Furlow's uptoparstaffing.com address the following message:  "going down."  Furlow responded, "What?  What are you talking about?  Going down what?"  "Dawson" then replied, "use your imagination!"  "She" also asked Furlow to call "her" on "her" cell phone.

On April 9, "Dawson" e-mailed Furlow at his uptoparstaffing.com account after 10 p.m., asking "You up?"  Over one hour later, "Dawson" e-mailed again to ask, "When are we going to get that drink?  Lets just do it, who cares?"

On April 11 and 12, "Dawson" and Furlow exchanged e-mails trying to arrange a phone call.

On April 13, Furlow forwarded to his Club e-mail address several of the e-mail chains between "kristen-dawson@live.com" and his gmail.com and uptoparstaffing.com accounts.

The e-mail exchanges between "kristen-dawson@live.com" and Furlow ended with the April 14 "dick" e-mail that Furlow presented to Dawson on April 15.

Walder showed Dawson the live.com e-mails. She was shocked and deeply disturbed by the e-mails; when she read the last one, she broke down crying. Dawson denied sending the e-mails, said she had never seen them before, and suspected Furlow had written both sides of the conversations because "it was very apparent it was his language." She surmised he had done so because "he knew that [his prior] conduct was wrong so he was trying to protect himself by creating an account where [Dawson] sent him stuff in order to make [her] look a part of it." After Dawson read the live.com e-mails, she told Walder she felt she was working in a hostile work environment.

Dawson asked Walder and Lindsey to investigate the situation and determine who sent the e-mails. She also asked, while the investigation was pending, that she have less direct communication with Furlow. Walder accommodated Dawson's request by having her and Furlow each report to separate board members who then conferred with one another. Fearing someone was out to get her, Dawson asked to park in the members' lot at the Club so she would not have to walk to the isolated employee parking lot. Walder allowed this.

Walder began investigating the live.com e-mails. Dawson volunteered access to her personal computer, e-mail accounts, and her boyfriend's personal computer. She also established to Walder's satisfaction that she could not have sent the April 14 "dick" e-mail—she was dining at a restaurant with her boyfriend's family when the e-mail was sent and Walder confirmed with the boyfriend's father and two restaurant servers that

12

Dawson did not send any e-mails during that time. Walder later told Dawson he also learned live.com e-mails can not be sent from mobile devices.

Walder told Dawson "he believed 100 percent" that she did not write the live.com e-mails. In addition to confirming she could not have sent the April 14 e-mail, Walder concluded there was nothing consistent between the tone and format of Dawson's work e-mails and the live.com e-mails, and it was apparent to Walder that Dawson had not seen the e-mails before he showed them to her.

Walder told Furlow, "I will need to look through your computers[,] both personal and professional, along with your BlackBerry." Furlow responded, "I have a great deal of personal information on that." Furlow agreed to "bring them in"—presumably referring to his personal computers—but he never did. The appellate record does not reveal whether Furlow ever made his work computer or e-mail available. However, Furlow did confirm that when he sent e-mails to Dawson from his work computer he had to select between her Club account and "kristen-dawson@live.com."

Dawson insisted the Club investigate Furlow's e-mail and became "exasperated" when Walder did not require Furlow to make his computers available for examination. Walder considered "inappropriate" Dawson's efforts to "set deadlines on [his] schedule of when" to examine Furlow's computers "[b]ecause it wasn't up to her as to what direction th[e] investigation was going."

Ultimately, Walder was unable to determine who sent the live.com e-mails, but concluded that fact was "immaterial to the investigation." Walder explained in an April 26, 2011 memorandum regarding his investigation: "I . . . have asked [Furlow] for access

13

to his personal [e-mail] twice. Each time he has said that he would provide access, also claiming that there is confidential information in the [e-mail]. [Furlow] has not given me access at this time. [¶] Considering that [Furlow] has not granted access to his [e-mail] addresses, I have to then conclude that the [e-mails] are nothing more than hearsay. We have words on paper but nothing to prove that the [e-mails] are factual. I also have to conclude that without the [e-mails], the situation is reduced to poor management."

On April 27, Dawson met with Walder, Lindsey and Club president Ron Smith. They told Dawson the investigation was finished; it was inconclusive as to who sent the live.com e-mails; the Club could not reprimand Furlow without proof he sent the e-mails; and, even if he sent them, it was from his personal e-mail and not his work address. Dawson asked about continuing to investigate the source of the e-mails, but Walder responded that "if [Furlow] doesn't hand [his computers] over, there's not much [the Club] can do." The investigation ended and Dawson and Furlow continued working together. Furlow was reprimanded for his handling of the wine vendor incident, but not for sexual harassment.

Discouraged with the outcome of the Club's investigation, Dawson retained legal counsel and filed a lawsuit against the Club and Furlow on May 24, 2011, alleging sexual harassment (against both), failure to prevent harassment (against the Club), and intentional infliction of emotional distress (against both). Walder received a draft of the complaint. The day he received it, Walder had intended to offer Dawson a new position at the Club: catering and special events manager. The following day, Walder told Dawson, "I was going to offer you this position, but then I received your lawsuit."

14

Walder ultimately offered Dawson the new position. He initially referred to it as a promotion, but later acknowledged it was not. Furlow called it a "lateral" move. Dawson considered it a "step down" because she would no longer oversee the food and beverage department or manage the 20-person restaurant staff, but rather, would be in a special event sales role. The new position included no pay raise and required Dawson to have the same amount of communication, if not more, with Furlow. Dawson told coworker Murders she felt the Club was retaliating against her by offering the new position.

Dawson felt "Walder's conduct towards [her] took a drastic turn" and that her "days were numbered." Walder viewed Dawson's lawsuit as an act of retaliation and feared "she would be looking for anything possible in an attempt to try to hurt the [C]lub." He offered to hire an investigator to look into Furlow's e-mails if she dropped the lawsuit. In a June 1 e-mail to Dawson's attorney, Walder wrote—for the first time—that Dawson had "performance" issues. Walder would not answer Dawson's questions about the purported performance issues or Club vacation policy, instead requesting that Dawson decide promptly whether she would accept the new catering role.

Walder testified in his deposition that Dawson was "incompetent" 75 percent of the time he worked with her, and that her performance was merely "satisfactory" the remaining 25 percent of the time. He claimed that Dawson's incompetence included failing to return phone calls, being unable to quote him certain prices, and lacking planning skills. Although Walder said Dawson was incompetent in planning a meeting for his company, he admitted he later "raved to [her] about how great the event was."

15

Walder also testified in his deposition that he changed his mind about Dawson's authorship of the live.com e-mails based on an e-mail Furlow allegedly received from the slightly different "kristen_dawson@live.com"[7] account during the course of the litigation.[8] Walder did not confirm that Dawson sent the e-mail.

On June 3, Dawson and Walder exchanged several e-mails about some of the terms of the new catering position. Walder told Dawson he needed her decision soon or they would find someone else for the role.

On June 8, Furlow notified Dawson via e-mail that another employee would take over her role of scheduling bartender and cocktail server shifts. Dawson e-mailed Walder the following day to accept the catering position because she found "it apparent that [her] responsibilities are slowly being taken away anyway."

On June 10, Walder recommended to the Club's board that the Club terminate Dawson's employment. The board followed Walder's recommendation and voted to terminate Dawson. Walder prepared a termination letter, and he and Stotz met with

---

[7]    This address has an underscore instead of a dash between "kristen" and "dawson."

[8]    The unedited e-mail reads: "Joe i heard you were let go from CCRB. i have always had it in me to bring closure to move on and forgive and this is my closure. you are an ass. the most complete asshole I have ever met. i was so ready to be your friend and make that place rock and you couldn't deal with that. i have moved on and have a new job and boyfriend. i was ready to make CCRB our place and we could have and had a lot of fun doing it. your wife sent me a stupid email threatening me but you said you were in a bad marriage, figure your shit out Joe, again if you are happy its cool if not dont fuck with people! i have my peace now, time to move on. sorry it didn't work, coulda been great and a lotta fun, thats all for me, i feel better and able to move on and past us. still sorry u couldnt figure it out :(  [¶]  no need to reply whewwww  [¶]  i know u wanted to fuck me after that :)  c-ya k?  [¶]  bye! :)"

16

Dawson to notify her of her termination, which was effective immediately. Walder's letter cited the following bases for Dawson's termination: (1) her submitting to the accounting department a personnel action request (PAR) that sought to retroactively reduce an hourly employee's pay rate without first notifying him; (2) her "previous performance issues," including her responsiveness to customers; and (3) poor management of a Memorial Day event.

Dawson disagreed with Walder's cited bases. Regarding the PAR, Dawson explained that when she hired Greg LeChance as a server, she told him that he would start with a training pay rate of $8.50 per hour, but he would not be eligible for tips; when his training was complete, after about two weeks, his hourly pay would decrease to $8.00 per hour but he would be eligible to share in tips. Someone informed Dawson that LeChance had completed his training and was participating in tips, but his hourly pay rate had not been reduced. Dawson completed a PAR requesting a 50-cent per-hour pay reduction for the current pay period and submitted the PAR to accounting for approval by Furlow as Club manager. Accounting caught the retroactive discrepancy and the PAR was never implemented.

As for her performance issues, Dawson disputed Walder's assertion that he had verbally counseled her on several occasions. The only occasion Dawson recalled was Walder commenting on his secretary and Dawson playing phone tag while coordinating the menu for Walder's corporate event at the Club. But even then, Walder did not communicate to Dawson that his secretary was frustrated with Dawson's responsiveness. Walder understood that as a Club member and board member he was able to complain to

17

HR about Club employees, but he never did so regarding Dawson.  He apparently mentioned Dawson's responsiveness to Furlow in December 2010 or January 2011, but Furlow considered Walder's grievances to be "miniscule" issues that did not "merit actual documentation."  Walder acknowledged Dawson had never been disciplined in writing.

Regarding the Memorial Day event, Dawson cited an e-mail from Furlow in which he wrote to Dawson, "No need to be here Monday, Bea and I will cover the Memorial Day Holiday Tournament."

Stotz supervised Dawson while she gathered her personal belongings and escorted her to her car.  Stotz told Dawson she "felt like [Dawson's termination] was wrong."

Dawson amended her complaint to add a claim against the Club for wrongful termination in violation of public policy.

On September 25, 2012, the trial court granted the Club's motion for summary adjudication of Dawson's claims for sexual harassment, failure to prevent harassment, and intentional infliction of emotional distress.  The trial court viewed the evidence supporting Dawson's harassment claim "as falling into three separate categories":  (1) Furlow's conduct before April 15, (2) Furlow's showing the live.com e-mail to Dawson on April 15, and (3) Walder's showing Dawson the remaining 30 live.com e-mails.  The trial court rejected Dawson's retaliation arguments because retaliation "was unpled in [the harassment] cause of action" and "is not an element of a cause of action for sexual

18

harassment."[9]  Citing Dawson's testimony that she did not feel sexually harassed until Walder showed her the additional live.com e-mails during the course of the investigation she requested, the trial court found Dawson did not meet "her burden of showing that the additional e-mails shown to her during [the Club's] investigation represents sexually harassing conduct or that the conduct in this case was severe or pervasive."  Based on the same reasoning and findings, the trial court found that Dawson's claims for failure to prevent harassment and intentional infliction of emotional distress also failed.  Because the trial court had summarily adjudicated all claims in which Furlow was a named defendant, the court entered judgment in his favor on November 8, 2012.

The trial court granted Dawson leave to amend her complaint to add a cause of action for retaliation in violation of FEHA.  The Club then moved for summary judgment on Dawson's remaining wrongful termination and retaliation claims.  The Club conceded Dawson had made a prima facie showing of retaliation and, thus, the Club accepted the initial burden of establishing it had a legitimate, nonretaliatory reason for terminating Dawson.  The trial court accepted the Club's argument that Dawson's attempt to retroactively reduce LeChance's pay constituted a legitimate reason for termination,

---

9      The trial court clarified "that some of Plaintiff's arguments are more relevant to her [wrongful termination in violation of public policy claim] and Defendants have requested no ruling – and the Court expresses no opinion thereon – as to that cause of action."

rejected Dawson's contention that it was mere pretext,[10] and granted the Club's motion. The trial court entered judgment in favor of the Club on June 3, 2013.

On August 7, 2013, Dawson filed a notice of appeal purporting to appeal the November 2012 judgment in favor of Furlow and the June 2013 judgment in favor of the Club. Furlow moved unopposed to dismiss as untimely the appeal as to his November 2012 judgment. We granted his motion. Therefore, this appeal concerns only the June 2013 judgment in favor of the Club.

## DISCUSSION

Dawson contends the trial court erred by granting the Club's summary adjudication motion because the court misapplied sexual harassment law and did not view the evidence in the light most favorable to Dawson, which would have revealed triable issues of fact. She contends the trial court also erred by granting the Club's summary judgment motion because there is a triable issue of fact regarding whether the Club articulated a legitimate reason for terminating her.

On appeal from the entry of a summary judgment, we apply the same standard that was applicable in the trial court, i.e., we independently review the record to determine whether there are triable issues of material fact. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that

---

[10] The trial court noted that it "would agree that a triable issue as to pretext would exist *if* the only bases offered for Plaintiff's termination were poor performance issues such as mis-calendaring and mis-pricing."

party."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470 (*Miller*) [reversing grant of summary judgment in a sexual harassment and retaliation case where the "Court of Appeal failed to draw [reasonable inferences in favor of the nonmoving party] and took too narrow a view of the surrounding circumstances"].)

## I. *DEFENDANTS' SUMMARY ADJUDICATION MOTION*

We begin by examining the trial court's order granting summary adjudication of Dawson's claims for sexual harassment, failure to prevent sexual harassment, and intentional infliction of emotional distress.

### A. *Legal Framework*

FEHA "recognize[s] two theories of liability for sexual harassment claims. [Citations.]  '. . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment.' "  (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 149.)  Dawson alleged hostile work environment sexual harassment.

In construing FEHA, our high court has held that the hostile work environment form of sexual harassment is actionable only when the harassing behavior is pervasive or severe.  (*Miller*, *supra*, 36 Cal.4th at p. 462.)  To prevail, an employee must show that the harassing conduct was "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to

21

employees because of their sex." (*Ibid*.) "To be *pervasive*, the sexually harassing conduct must consist of 'more than a few isolated incidents.' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1048.) If the alleged harassment was not pervasive, the employee must show that it was "severe in the extreme." (*Herberg v. California Institute of the Arts, supra*, 101 Cal.App.4th at p. 151.)

"To be actionable, 'a sexually objectionable environment must be both objectively and subjectively offensive.' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284.) "That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception. Likewise, a plaintiff who does not perceive the workplace as hostile or abusive will not prevail, even if it objectively is so." (*Ibid*.)

Under FEHA, the existence of a hostile work environment depends upon the totality of the circumstances. (*Miller*, *supra*, 36 Cal.4th at p. 462.) " 'These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Ibid*.) "The United States Supreme Court has warned that the evidence in a hostile environment sexual harassment case should not be viewed too narrowly." (*Ibid.*) " '[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." [Citation.] . . . . [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced

22

by its target. . . .  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.' " (*Ibid.*, quoting *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81–82.)

B.  *Analysis*

1.  *Sexual harassment*

Dawson contends the trial court misapplied the law by not considering evidence of Furlow's and Walder's *retaliatory* conduct in connection with her *sexual harassment* claim and by not considering the totality of the circumstances.  We agree.  When viewed in the light most favorable to Dawson, the totality of the circumstances—including Furlow's (but not Walder's) retaliatory conduct—establish that triable issues of fact exist regarding Dawson's subjective belief that she was sexually harassed and whether that belief was objectively reasonable.

a.  *Furlow's (but not Walder's) alleged retaliation is relevant to Dawson's sexual harassment claim*

Regarding the trial court's "reject[ion]" of Dawson's retaliation theory as irrelevant to her sexual harassment claim, *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994 (*Birschtein*) is instructive.  There, plaintiff Michelle Birschtein worked on an assembly line in an auto manufacturing plant, which required

23

her to work in a fixed location as forklifts delivered parts and materials to the assembly line. (*Id.* at p. 997.) Forklift operator George Bonillia asked Birschtein on a date three or four times, but Birschstein declined each time and told him she did not want to go out with him. (*Ibid.*) Bonillia told Birschtein he wanted to " 'eat her,' " which upset Birschtein and prompted her to ask Bonillia what he meant. (*Ibid.*) Bonillia replied, " 'I want to eat you all over.' " (*Ibid.*) Birschtein yelled at Bonillia to leave, which he did after sitting on his forklift for a while. (*Id.* at pp. 997-998.) Two or three days later, Bonillia again approached Birschtein and told her he was having fantasies about bathing her in a tub surrounded by candles and carrying her to a bed covered with rose petals. (*Id.* at p. 998.) Birschtein yelled at Bonillia to leave, which he did after sitting on his forklift for another minute. (*Ibid.*) Birschtein complained to her foreman and began to carry mace to work. (*Ibid.*) After her complaint, Bonillia never *spoke* to Birschtein again. (*Ibid.*) But he did drive his forklift near her station five to 10 times each day and stare at her for five to 10 minutes each time. (*Ibid.*) Birschtein complained about Bonillia's staring, which then decreased to two or three times per day for five to ten seconds at a time. (*Ibid.*) Bonillia's stares were not sexual, they were upset. (*Id.* at pp. 998-999.) Bonillia's only post-complaint sexual act was one occasion when he grabbed his crotch while he drove his forklift by Birschtein's station, staring at her. (*Id.* at p. 999.) Birschtein's employer investigated Bonillia's conduct, but took no disciplinary or corrective action because the investigator " 'didn't feel that [Bonillia's] actions warranted it.' " (*Ibid.*) Birschtein sued for hostile work environment sexual harassment, and the trial court granted summary judgment for her employer. (*Id.* at pp. 999-1000.)

24

The Court of Appeal reversed. As relevant here, the court concluded Bonillia's *nonsexual*, *retaliatory* staring could still constitute *sexual* harassment. (*Birschtein, supra,* 92 Cal.App.4th at p.1001, citing *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 345-346 [" '[S]exual harassment does not necessarily involve sexual conduct.' "].) As the court explained, "What began as Bonillia's overt acts of sexual harassment (asking for dates, the 'eat you' remarks, his specifically sexual bathing fantasies) were later transmuted by plaintiff's reaction (her complaints to management about the offensive conduct) into an allegedly daily series of *retaliatory* acts—the prolonged campaign of staring at plaintiff—acts that were directly related to, indeed assertedly *grew out of*, the antecedent unlawful harassment." (*Id*. at p. 1002.) The court thus concluded Birschtein's evidence "was sufficient to raise a triable issue of material fact, i.e., whether Bonillia's apparent retaliatory acts were sufficiently allied with the prior acts of harassment to constitute a continuing course of unlawful conduct." (*Ibid*.)

Similarly, Dawson presented evidence that after she made clear during the Palm Springs phone call that she was only interested in a professional relationship with Furlow, his attitude toward her changed from one of romantic pursuit to retaliation. He cut Dawson out of the decision-making loop for job-related decisions and secretly met with her subordinates. This culminated in the April 14 incident regarding Furlow's replacement of a wine vendor during which he yelled loudly at Dawson. The next day, Furlow questioned Dawson's mental health, showed her the April 14 "dick" e-mail, and told Dawson, "I have a lot more where those came from.' " After Dawson complained to HR, Furlow continued to keep her in the dark on management decisions and reassigned

25

some of her duties. Considering this evidence in the light most favorable to Dawson, we conclude Furlow's "apparent *retaliatory* acts were sufficiently allied with the prior acts of *harassment* to constitute a continuing course of unlawful conduct" (*Birschtein*, *supra*, 92 Cal.App.4th at p. 1002, italics added) such that the trial court should have considered the retaliatory acts in connection with Dawson's sexual harassment claim.[11]

Dawson has not convinced us that *Walder's* alleged retaliatory acts are relevant to her sexual harassment claim.[12] Whereas the nonsexual retaliation in *Birschtein* was a "transmutat[ion]" of *Bonillia's own* previous sexual harassment (*Birschtein*, *supra*, 92 Cal.App.4th at p. 1002), Dawson has not directed us to evidence in the record that shows *Walder's* alleged acts of retaliation "were sufficiently allied with [Furlow's alleged] prior acts of harassment" (*ibid.*), or were directed at Dawson "because of [her] sex" (*Miller*, *supra*, 36 Cal.4th at p. 462)—as opposed to her engagement in the protected activity of reporting or suing for alleged sexual harassment—such that the trial court should have considered them in connection with Dawson's sexual harassment claim.

Dawson argues her case is like *Miller*, *supra*, 36 Cal.4th at page 466, which she characterizes as the Supreme Court having found evidence of a hostile work environment based, in part, on a "supervisor's refusal to intervene in abusive conduct against the plaintiff by another employee, and the supervisor's retaliation against the plaintiff . . .

---

[11]   The Club's explanation that certain of the alleged retaliatory acts were merely the result of managerial streamlining resulting from Furlow's hire is for the trier of fact to evaluate.

[12]   They are, of course, relevant to her claims for retaliation and wrongful termination in violation of public policy.

after she cooperated with an internal affairs investigation into the supervisor's conduct." (Underscoring omitted.)  However, *Miller* is readily distinguishable because the retaliating supervisor was having an affair with (among others) the employee who was abusive to the plaintiff and it was that affair (together with the others) that contributed to the hostile environment of which the plaintiff complained.  (*Id*. at pp. 466-468.)   There are no facts similarly linking Walder's alleged retaliatory conduct to any earlier harassment in which Walder was involved.

Therefore, we conclude the trial court erred by not considering evidence of Furlow's alleged retaliatory conduct in connection with Dawson's claim for sexual harassment.  Thus, we will consider that evidence among the totality of the circumstances supporting Dawson's sexual harassment claim.

b.  *Whether Dawson subjectively felt harassed is a triable issue of fact*

The Club argued below, as it does now, that Dawson testified she did not subjectively believe she was being sexually harassed until Walder showed her the live.com e-mails on April 15.  The trial court agreed and appears to have considered only whether being shown the live.com e-mails during the course of the investigation could constitute sexual harassment.  We conclude the trial court erred by viewing the evidence too narrowly.  (*Miller*, *supra*, 36 Cal.4th at p. 462; *Oncale v. Sundowner Offshore Services, Inc.*, *supra*, 523 U.S. 75, 81–82.)

In support of its argument, the Club asserts "Dawson testified that she did not find any of the conduct spanning the two months after the invitation for golf lessons and

27

dinner, leading up to the April incident with the wine vendor, to be sexually harassing." This assertion is unsupported for at least two reasons.

First, the Club's record citation does not support the conclusion. Dawson was asked in deposition, "But in between those two dates had anything happened that you thought was sexual harassment?" However, the "two dates" were not the December "invitation for golf lessons and dinner" and the "April incident with the wine vendor," as the Club represents; rather, they were "the February 20 [Palm Springs] phone call and the April 11 phone call" to "clear some things up" when Dawson was at a memorial service.

Second, the Club's argument ignores other portions of Dawson's deposition testimony where she cites conduct by Furlow *prior to the revelation of the live.com e-mails* that she considered "instance[s] of sexual harassment" by Furlow. For example, Dawson testified she considered the January conversation when Furlow told her his "wife found the e-mails" to be an "instance of sexual harassment" that made her "uncomfortable." She also testified she considered Furlow's February 20 Palm Springs phone call an "instance of sexual harassment" that made her uncomfortable. And she testified she considered Furlow's April 11 memorial service call to "clear some things up" an "instance of sexual harassment." In addition, although she did not characterize it as an instance of sexual harassment, Dawson testified Furlow's January 2 "staying the night" e-mail was "offensive" and made her "uncomfortable." This evidence is sufficient to create

a triable issue of fact regarding whether Dawson subjectively felt that she was sexually harassed.[13]

c. *Whether Dawson objectively felt harassed is a triable issue of fact*

The trial court's finding that Dawson did not objectively feel harassed appears to have also been based on the court's acceptance of the Club's assertion that Dawson did not subjectively feel sexually harassed until Walder showed her the live.com e-mails. For the same reasons discussed above regarding Dawson's subjective belief, the trial court's finding is erroneous in connection with Dawson's objective belief.

Considering the "totality of the circumstances" (*Miller*, *supra*, 36 Cal.4th at p. 462), we conclude Dawson opposed the Club's motion with sufficient evidence to reach trial. Dawson testified she experienced several "instance[s] of sexual harassment" by Furlow before she ever saw one live.com e-mail. She testified the revelation and her reading of the live.com e-mail's further constituted sexual harassment. And she presented evidence that her rebuffing of Furlow's advances transmuted his harassing conduct from sexual to retaliatory. (*Birschtein*, *supra*, 92 Cal.App.4th at p. 1002.) This is sufficient to create a triable issue of fact.

Consistent with its theory that Dawson admitted she did not feel sexually harassed until Walder presented the live.com e-mails, the Club argues that Walder showing

---

13    We are unpersuaded by the Club's argument that Dawson did not make clear that she was complaining about "sexual harassment." Our Supreme Court "do[es] not believe employees should be required to elaborate to their employer on the legal theory underlying the complaints they are making, in order to be protected by the FEHA." (*Miller*, *supra*, 36 Cal.4th at p. 474.) And, in any event, Dawson told Walder after she read the live.com e-mails that she felt she was working in a hostile work environment.

29

Dawson the e-mails cannot constitute sexual harassment because it was not done "because of [her] sex" (*Miller*, *supra*, 36 Cal.4th at p. 462). In other words, Walder did not show Dawson the live.com e-mails to sexually harass her, but rather, to investigate her claim of sexual harassment. We are not persuaded that *Walder's* presentation of the live.com e-mails to Dawson during the investigation precludes a finding that *Furlow* sexually harassed her.

Dawson presented evidence from which a jury reasonably could conclude Furlow wrote the live.com e-mails *with the intent that Dawson and others would see them*. Regarding authorship, (1) Furlow possessed the e-mails; (2) he sent virtually identical e-mails to Dawson's Club account and the live.com account without ever questioning the need to repeat himself verbatim in separate e-mail chains; (3) similarly, he never questioned the parallel e-mail chains about golf lessons—the first started by him on December 12, and the second started by "Dawson" on the live.com account on December 18; and (4) Furlow never let the Club examine his computer. The Club can, of course, argue at trial that Furlow is not the author of the live.com e-mails.

As for Furlow's intent that Dawson see the e-mails, Dawson explained it well in her deposition. When asked why she thought it was sexually harassing conduct by Furlow for Walder to show her the live.com e-mails during an investigation that she wanted done, Dawson responded, "Because he gave them to them. I mean, he gave them the e-mails. So it's still – just because [Furlow] didn't give them to me directly, he still put it out there for people to see. That's still sexual harassment." Put differently, a jury could reasonably conclude that Furlow drafted the e-mails with the intent that he or

30

someone else would ultimately show them to Dawson and other coworkers to give the false impression that she was voluntarily participating in the conduct about which she would later complain.

The Club also contends Dawson could not have been sexually harassed by the live.com e-mails because she only briefly viewed a few of them. While Dawson testified she could not remember exactly how many of the e-mails she read, Walder documented it in detail in his investigation notes: "I presented the e-mails that [Furlow] had given me one at a time to [Dawson]. I observed her to read each one individually."

The Club attempts to downplay the severity of the live.com e-mails, writing, "[a]t their worst, kristen-dawson@live.com makes a joke about 'going down' and calls Furlow a 'tough ass' and a 'dick,' but these are more insults than sexually suggestive." We conclude a jury could disagree with the Club's characterization of the e-mails. Indeed, it appears Walder did; in his deposition, he gave the following "evaluation" of the live.com e-mails: "From my observation, we have a 30-something-year-old female and a 30-something-year-old male that may have had some sort of a sexual attraction between each other. The e-mails that came from the female were much more inappropriate than the e-mails that came from the male. Do I consider that creepy? If she's trying to get laid, it is what it is." In addition, nothing in the record suggests the live.com e-mail about "going down" was any more "a joke" (as the Club contends) than Bonillia's statement in *Birschtein* that he wanted to " 'eat [Birschtein],' " and " 'eat [Birschtein] all over.' " (*Birschtein*, *supra*, 92 Cal.App.4th at p. 997.) Further, there is abundant additional "sexually suggestive" content in the live.com e-mails, such as "Dawson's" suggestion of

31

"attached [hotel] rooms"; "her" threat to tell the Club's board "she" felt "sexually exploited" by Furlow; "her" threat to tell Furlow's wife "how we had sex and how quick you went after me"; and her reference to Furlow's "dick."

Aside from the specific content of the live.com e-mails, a jury could consider Furlow's alleged concoction of a virtual "Dawson" who threatens to blackmail Furlow and who others perceive as "inappropriate" and "trying to get laid" as contributing to a hostile work environment. Indeed, Dawson testified it was not just her reading the e-mails that she felt was sexually harassing but also learning "the fact that the e-mails existed and were about [me]. [¶] . . . [¶] It was—to read these e-mails that were not me that someone else had written, and I think the sexually explicit manner is sexual harassment."

In sum, considering the totality of the evidence in the light most favorable to Dawson, we conclude she opposed the Club's motion for summary adjudication as to her sexual harassment claim with "evidence of ' "sufficiently severe or pervasive" ' conduct that ' " 'alter[ed] the conditions of [her] employment' " ' such that a jury reasonably could conclude that the conduct created a work environment that qualifies as hostile or abusive to employees because of their gender." (*Miller*, *supra*, 36 Cal.4th at p. 468.) Consequently, the trial court erred by summarily adjudicating the claim in the Club's favor.

2. *Failure to prevent harassment*

The trial court found Dawson's claim for failure to prevent harassment failed "[f]or the same reasons" as her sexual harassment claim. Based on our conclusion that the trial

32

court erred by summarily adjudicating Dawson's sexual harassment claim, we likewise conclude the trial court erred by summarily adjudicating her claim for failure to prevent harassment.

3. *Intentional infliction of emotional distress*

Similarly, the trial court found Dawson's claim for intentional infliction of emotional distress failed "based on the [sexual harassment] findings." For the reasons just discussed, we conclude the trial court also erred by summarily adjudicating Dawson's intentional infliction of emotional distress claim.

## II. *THE CLUB'S SUMMARY JUDGMENT MOTION*

Dawson contends the trial court erred by granting the Club's summary judgment motion aimed at her claims under FEHA for retaliation and wrongful termination in violation of public policy. She contends there are triable issues of fact regarding the legitimacy of the Club's stated bases for her termination. We agree.

A. *Legal Framework*

In relevant part, FEHA makes it unlawful "[f]or any employer . . . to discharge . . . or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . ." (§ 12940, subd. (h).) To state a claim of retaliation under FEHA, a plaintiff must show: (1) she engaged in a protected activity, (2) she was subjected to an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042.)

33

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792) and often referred to as the *McDonnell Douglas* presumption.  This approach requires the plaintiff "to establish a prima facie case of [an unlawful employment practice]. . . .  [¶] If the plaintiff meets this burden, ' " 'the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision. . . .' . . ." ' . . . [¶] . . . [I]f the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally [engaged in an unlawful employment practice] against him or her.  [Citation.]  The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for [the unlawful employment practice]."  (*Wills v. Superior* Court (2011) 195 Cal.App.4th 143, 159-160.)

"A defendant's summary judgment motion ' "slightly modifies the order of these . . . showings." '  [Citation.]  Consequently, the [defendant] ha[s] the initial burden to either (1) negate an essential element of [the plaintiff's] prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the adverse action].  [¶]  '[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee . . . must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a

reasonable trier of fact could conclude the employer engaged in [an unlawful employment practice].' " (*Wills v. Superior Court*, *supra*, 195 Cal.App.4th at p. 160.)

"In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. . . . [E]ven though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable. And an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.) Also " '[s]peculation cannot be regarded as substantial responsive evidence.' [Citation.] In order to raise an issue as to the employer's credibility, the employee must set forth specific facts demonstrating ' "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' " ' " (*Ibid*., italics omitted.)

B. *Analysis*

1. *Retaliation*

The parties agree that Dawson stated a prima facie case for retaliation—she took the protected act of complaining about sexual harassment and filing a sexual harassment lawsuit and was terminated shortly thereafter. Our starting point, then, is assessing whether the Club met its burden of identifying a legitimate reason for terminating Dawson.

"Legitimate reasons" in this context are reasons that are "facially unrelated" to prohibited retaliation, and which, if true, would thus preclude a finding of retaliation. (*Guz*, *supra*, 24 Cal.4th at p. 358.) The employer's termination decision need not be correct; rather, the employer need only prove it had an honest, good faith belief that termination was warranted based on the facts as it understood them at the time. (*Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1157.) However, "in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions." (*Guz*, *supra*, 24 Cal.4th at p. 363.) The Club's articulated reasons—Dawson's attempt to reduce LeChance's wages, performance issues, and poor management of the Memorial Day event—if true, are "facially unrelated" to Dawson's sexual harassment complaints and lawsuit. Thus, the Club has met its burden.

The Club having met its burden, the *McDonnell Douglas* presumption "disappears" and Dawson "bears the burden of persuasion with respect to all elements of the cause of action, including the existence and causal role of . . . retaliatory animus." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715 (*Mamou*).) Dawson can meet this burden by persuading the court that a retaliatory reason more likely motivated her termination or by showing that the Club's proffered explanation is "'unworthy of credence.'" (*Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 664.) The court "can take account of manifest weaknesses in the cited reasons in considering whether those reasons constituted the real motive for the employer's actions,

36

or have instead been asserted to mask a more sinister reality." (*Mamou*, *supra*, 165 Cal.App.4th at p. 715.)

We will dispose of the Club's performance-related justifications because the trial court agreed with Dawson "that a triable issue as to pretext would exist *if* the only bases offered for Plaintiff's termination were poor performance issues . . . ."[14] Dawson adduced evidence showing she was never counseled about her performance;[15] she never received any written disciplinary actions or negative performance feedback; although after Dawson's termination Walder characterized her as "incompetent," he "raved" about her performance after his corporate event at the Club; Dawson received a commendation from the Club's board, signed by Walder, noting her personal contribution to the Club's success, just months before her termination;[16] the first mention of any performance-related issues was in a June 1 e-mail from Walder to Dawson's counsel, sent one week after she filed her lawsuit; despite her supposed performance issues, the Club offered Dawson a new role that Walder initially characterized as a promotion; Walder told Dawson, " 'I was going to offer you this position, but then I received your lawsuit' "; and

---

14    Even the Club now argues "[t]he *primary* basis for Dawson's termination . . . was the retroactive reduction of an employee's pay." (Italics added.)

15    She acknowledged playing phone tag with Walder's secretary but was never informed the secretary was frustrated with her.

16    The Club argues this "commendation is not based on any remarkable contributions by Dawson" because "**every employee** gets a 'commendation' from the Board **every year** on their anniversary." The trier of fact can decide whether to accept the Club's assertion that it would issue a commendation to an employee whom a board member considered incompetent 75 percent of the time.

Dawson produced an e-mail from Furlow giving her Memorial Day off and indicating he and another coworker would cover the event that day. This evidence is more than sufficient to create a triable issue of fact regarding whether Dawson's termination for performance-related issues was mere pretext.

Dawson focuses primarily on the wage-reduction issue, contending she opposed the Club's summary judgment motion with sufficient evidence to show the Club's purported reliance on the wage-reduction issue is " 'unworthy of credence.' " (*Clark v. Claremont University Center*, *supra*, 6 Cal.App.4th at p. 664.) The Club, quoting the California Department of Industrial Relations' website, argues " '[d]ecreases in wage rates can only be made prospectively and not retroactively where work was performed and earned under a specified rate.' " However, Dawson testified in deposition that she notified LeChance in advance that his pay rate would decrease by 50 cents per hour after he began participating in the tip pool.[17] Walder confirmed with LeChance that Dawson had done so. Dawson also testified about her understanding that the PAR was merely a recommendation that would not take effect until approved by her manager, as evidenced

---

[17] The Club suggests its termination also rested on Dawson's failure to promptly reduce LeChance's pay rate. Assuming a 40-hour work week, this oversight cost the club $20 per week. The Club cites no evidence that a management oversight of this degree is a terminable offense. Nor has the Club established that the " 'after-acquired evidence [of Dawson's alleged incompetence] was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.' " (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1173, quoting *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352, 362–363.)

38

by two approval signature lines on the PAR form.[18] Walder called this explanation a "falsity," even though he thought the form had only one signature line. All of this casts some doubt on the correctness of the Club's purported basis for terminating Dawson, but the Club did not have to be correct—it only had to have an honest, good faith belief that it was correct. (*Slatkin v. University of Redlands*, *supra*, 88 Cal.App.4th at p. 1157.) As we will now discuss, Dawson cites evidence that creates a triable issue of fact regarding the honesty and good faith with which the Club—namely Walder—held that belief.

An examination of *Reeves v. Safeway Stores* (2004) 121 Cal.App.4th 95 (*Reeves*) will put Dawson's evidence in perspective. Reeves was a grocery store employee who complained to his store manager that female coworkers were being sexually harassed. (*Id.* at p. 100.) The store manager "seemed resentful and sought to 'trivialize' the complaints." (*Ibid.*) Reeves was later accused of pushing a female coworker so he could reenter the store after business hours (his shift had just ended and he urgently needed to use the bathroom). (*Id.* at pp. 101-102.) The store manager referred the pushing incident to store security for an investigation, knowing that all his prior referrals to security had resulted in terminations. (*Id.* at p. 117.) Security conducted its investigation and recommended Reeves's termination to a district manager who was otherwise uninvolved in the incident or investigation. (*Id.* at p. 104.) The district manager terminated Reeves

---

18     We are unmoved, as was the trial court, with Dawson's "no harm, no foul" suggestion that she should not have been terminated because her attempted wage reduction was caught before it ever went into effect. Simply because a potential crisis was averted does not mean the Club could not have lost confidence in Dawson's management ability (assuming the club *honestly* lost that confidence over the wage-reduction issue—an issue for the trier of fact to decide).

based on a 15- to 20-minute conversation with the investigator.  (*Id*. at pp. 104-105.)

Reeves sued for retaliation under FEHA, alleging he was terminated for complaining about sexual harassment of his female coworkers.  (*Id*. at p. 105.)  The trial court granted summary judgment for the employer, but the Court of Appeal reversed.  (*Ibid*.)

The Court of Appeal explained summary judgment was inappropriate because, although the grocery store had established the district manager was unbiased, Reeves had presented sufficient evidence from which a jury could infer the store manager—who initiated and participated in the investigation—was motivated by retaliatory animus. (*Reeves*, *supra*, 121 Cal.App.4th at pp. 108-109.)  The court illustrated its reasoning with the following example:  "A supervisor annoyed by a worker's complaints about sexual harassment might decide to get rid of that worker by, for instance, fabricating a case of misconduct, or exaggerating a minor instance of misconduct into one that will lead to dismissal.  Another manager, accepting the fabricated case at face value, may decide, entirely without animus, to discharge the plaintiff.  It would be absurd to say that the plaintiff in such a case could not prove a causal connection between discriminatory animus and his discharge."  (*Ibid*.)  The court concluded Reeves created a triable issue of fact by presenting evidence of, among other things, the store manager's resentment of Reeves's sexual harassment complaint; the adequacy of the manager's investigation of that complaint, the "zeal and sincerity" of which a "jury could doubt"; the manager's "show[ing] insensitivity, at best, to matters of gender"; the manager's substantial certainty that his referral of the disciplinary investigation to security would result in termination

(*id.* at pp. 117-118); and the security investigator's presentation of the results of his investigation to the district manager "in a highly unbalanced way." (*Id*. at p. 120.)

Similar to *Reeves*, Dawson opposed the Club's summary judgment motion with evidence from which a factfinder reasonably could infer that Walder harbored retaliatory animus toward Dawson. Dawson adduced evidence showing Walder considered her frustration with the "zeal and sincerity" of his live.com e-mail investigation to be "inappropriate"; Walder considered Dawson's lawsuit against the Club to be retaliatory and feared she was trying to hurt the club;[19] Walder offered to hire an investigator to look into Furlow's e-mails *if* Dawson dropped her lawsuit; Walder told Dawson, "I was going to offer you this position, but then I received your lawsuit"; Walder characterized the "Dawson" side of the live.com e-mail exchanges "much more inappropriate" and as "her" "trying to get laid," thus "show[ing] insensitivity, at best, to matters of gender" (*Reeves*, *supra*, 121 Cal.App.4th at p. 117); Walder never raised performance issues with Dawson until he e-mailed her counsel just after Dawson filed her lawsuit; and the Club's HR representative, Stotz, said she felt Dawson's termination was wrong.

---

[19] The Club argues that Walder's deposition testimony "suggests that it was [another board member], rather than Walder, who raised the concern of further litigation if Dawson was terminated." We are not persuaded. Walder testified:

"Q.: So there was some discussion in the board that if you terminated [Dawson] she was going to amend her lawsuit to claim wrongful termination?
"A: It was speculated, yes.
"Q: Who speculated that?
"A: I did, for one. [¶] . . .
"Q: And you saw that as retaliation.
"A: I did."

41

Dawson also adduced evidence from which a factfinder reasonably could conclude Walder's retaliatory animus infected the termination process. Walder testified he "provided the facts to the board"—"what the board learned about Ms. Dawson's case it learned from [him]"; although Walder stated he consulted with the Club's corporate counsel before terminating Dawson, Walder did not provide that counsel with any documents and "everything [counsel] learned about the circumstances, he learned from [Walder]"; and Walder recommended that the board terminate Dawson, a recommendation that was followed by eight of the board's nine members.

The Club argues Walder exhibited no retaliatory animus "because after she filed her lawsuit, Walder offered her a promotion" and extensively negotiated its terms just prior to her termination. But even Walder acknowledged the new job was not a promotion. In addition, a jury could find that at the same time Walder was negotiating Dawson's new role, he was also building a case against her, as evidenced by his June 1 e-mail to her counsel asserting performance issues.[20]

---

[20]    In at least this respect, this case is similar to *Mamou*, *supra*, 165 Cal.App.4th 686. In *Mamou*, the plaintiff was terminated after he resisted his supervisor's efforts to weed out employees who took sick leave. (*Id.* at pp. 696, 706.) The Court of Appeal reversed a grant of summary judgment in favor of the employer, finding a triable issue of fact existed regarding the employee's termination of the plaintiff on the "hyperbolic" and "hypothetical" grounds of "theft." (*Id.* at p. 720.) The employer's theories of theft evolved from stealing the company's trademarks to stealing the company's business opportunities based on the employee's preparing to open a related, though not competing, business using a name allegedly protected by the employer's trademarks. After terminating the plaintiff for admittedly non-performance-related reasons, his manager instructed another employee to " 'build[] a file relating to [the plaintiff's] performance over the last six months.' " (*Id.* at p. 706.) Under the circumstances, the court concluded there was "ample evidence" to support the conclusion that the employer's reasons for

In sum, ample evidence would allow a trier of fact to conclude that the Club's purported bases for terminating Dawson are unworthy of credence. Consequently, the trial court erred by granting the Club's summary judgment motion as to Dawson's claim for retaliation.

2. *Wrongful termination in violation of public policy*

The trial court ruled that because it "found that Plaintiff's cause of action for retaliation lacks merit, the first cause of action for termination in violation of public policy would also fail." Because we concluded the trial court erred by granting summary judgment on Dawson's retaliation claim, we likewise conclude the trial court erred by granting summary judgment on her claim for wrongful termination in violation of public policy.

## DISPOSITION

The June 3, 2013 judgment is reversed. The order granting summary adjudication is vacated with respect to the Club, and the order granting summary judgment is vacated. The trial court is directed to enter an order denying the motion for summary adjudication

terminating the plaintiff were pretextual, "beginning with the fact that [the employer] never rested on a single coherent explanation for its firing of [the plaintiff], and that several if not all of its explanations were, to put it mildly, questionable." (*Id*. at pp. 715-716.)

43

as to the Club and an order denying the motion for summary judgment.  Dawson is entitled to her costs on appeal.

                                        NARES, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.